*1074 MODIFIED OPINION ON MOTION FOR REHEARING
LEE, J.,
for the Court.
¶ 1. Catherine Givens’ motion for rehearing is granted. The original opinion of this Court is withdrawn and the following opinion substituted therefor.
¶ 2. Catherine Givens appealed from an order of the Union County Chancery Court modifying visitation to include a monthly visit with Todd Nicholson’s parents who reside in Memphis. Givens appealed, arguing that the chancery court judge abused his discretion in altering the visitation schedule to include grandparent visitation. In our original opinion handed down March 2, 2004, this Court affirmed the trial court, finding that no visitation had been conferred upon the grandparents. In her motion for rehearing, Givens correctly points out that this Court misapprehended Mississippi law in not requiring the chancellor to make specific findings of fact when modifying the visitation to include time with Nicholson’s parents. We hold that the chancellor’s order requiring Givens to surrender her son once a month to Nicholson’s parents constitutes grandparent visitation; therefore, the chancellor erred in granting the visitation.
FACTS AND PROCEDURAL HISTORY
¶ 3. Givens and Nicholson were granted a divorce by the Circuit Court of Shelby County, Tennessee on December 8, 1993. Givens was awarded primary custody of their minor child, Todd Aaron Nicholson, born on December 19, 1990. Nicholson was granted visitation and ordered to pay child support to Givens.
¶ 4. Aaron has lived with his mother and older half-sister in a number of residences since the divorce. The family first lived in Bartlett, Tennessee, where they were residing when Givens and Nicholson divorced.
¶ 5. When Aaron was three, he began medicated treatment for attention deficient hyperactivity disorder. While in preschool, Aaron began to exhibit violent behavior, began having night terrors, and suffered from depression. After Aaron’s behavioral problems continued in preschool and kindergarten, Givens decided to move the family to Mumford, Tennessee where Aaron completed first grade. In the middle of his second year in Mumford, Aaron began to have serious behavioral problems in school and his grades fell dramatically. By the end of Aaron’s third grade year, Givens decided to move to Vicksburg. Givens married again and the blended family of Givens and her two children, her new husband, and his son did, in fact, move to Vicksburg. After only nine months in Vicksburg, the family moved to New Albany. In a period of three years, Aaron lived in four different cities.
¶ 6. In the fall of 2001, while in fifth grade at New Albany Middle School, Aaron drew a picture of his classmate with an arrow through his head that said, “you are dead.” After this incident Aaron was admitted to Parkwood Hospital in the pre-adolescent psychiatric unit, and remained there about two weeks. During his stay at Parkwood, Aaron was diagnosed as having bipolar disorder, with symptoms of attention deficit disorder with hyperactivity.
¶ 7. Because Aaron had extreme difficulty getting along with other children, upon his discharge from the hospital, his doctors advised Givens that she should home school Aaron. The doctors felt that if Aaron, who is dyslexic, could learn to read at his age level it would help curb his frustration and lower his anxiety. In addition to being home schooled, Aaron saw a reading tutor three times a week.
*1075 ¶ 8. Nicholson moved to Connecticut before the divorce was finalized and has since remained there. Nicholson has also remarried but has no other children. He is a senior customer service agent with Federal Express and has been employed there for twelve years. Since the divorce, Nicholson has maintained regular contact with Aaron, calling him on Sunday nights. However, he has only seen Aaron an average of three times per year since the divorce. Nicholson received about three weeks of vacation per year and spent the majority of that time in Memphis visiting with his parents, where he would also see Aaron on the weekends.
¶ 9. Prior to September 11, 2001, as an employee of Federal Express, Nicholson was able to “jump seat” from Connecticut, to Memphis, Tennessee free of charge. After September 11, the Federal Aviation Agency ended all jump seating.
¶ 10. On October 12, 2001, Nicholson filed a petition in the Chancery Court of Union County seeking permanent custody of Aaron and the discontinuation of child support paid to Givens. Givens answered the petition and filed for modification of Nicholson’s summer visitation and for an increase in child support paid by Nicholson. Following a hearing on February 14, 2002, the chancellor ordered that Aaron reside with his father in the State of Connecticut during the summer months of 2002, and held all other matters in abeyance. Nicholson’s parents were not a party to the litigation.
¶ 11. On August 1, 2002, a second hearing was conducted in the matter. The chancellor’s opinion and judgment entered on August 19, 2002, denied Nicholson’s request to modify custody and Givens’ request for an increase in child support. However, the chancellor modified visitation. Included in this order was the following excerpt regarding a monthly visit with Nicholson’s parents.
This Court further finds that the prior Orders of this Court are hereby modified in that the Mother shall deliver the minor child to the home of the paternal grandparents at 7:00 p.m. on the second (2nd) Friday of each month and the child shall be returned to the home of the Mother at 6:00 p.m. on the following Sunday in order to give the Father a definite monthly visitation period to see the child if he is able to travel to Memphis and to allow the child the opportunity to maintain ties with his extended family when the Father is unable to travel to Memphis.
ISSUES AND ANALYSIS
I. DID THE CHANCELLOR CONFER VISITATION TO THE GRANDPARENTS?
¶ 12. The first issue to be determined is whether the chancellor effectively granted the grandparents visitation with the child. This Court agrees with Givens that the chancellor granted the grandparents visitation. The effect of the chancellor’s ruling is that on the second Friday of each month, Givens must transport her son to the paternal grandparents’ house in Memphis. The last clause of the paragraph indicates that the purpose of this monthly trip to Memphis is to grant to the child an opportunity to interact with his extended family “when the Father is unable to travel to Memphis.” The inclusion of this clause leads this Court to the understanding that the monthly Memphis visits will occur by order of the court regardless of Nicholson’s ability to join his family in Memphis.
¶ 13. Visitation rights afford the noncustodial parent the opportunity to maintain a healthy relationship with his or her child. Porter v. Porter, 766 So.2d 55, 58
*1076 (¶ 13) (Miss.Ct.App.2000). Visitation allows interaction between the child and the non-custodial parent, and allows the noncustodial parent to exercise his rights as a parent. In Cox v. Moulds, 490 So.2d 866 (Miss.1986), the supreme court discussed the inherent authority a non-custodial parent possesses when exercising visitation.
We are afraid that by labeling the rights of the non-custodial parent “visitation” we imply an inordinate subordination of those rights in quality. That there will be no misunderstanding in the future the chancellor should approach the fixing of visitation rights with the thought in mind that, absent extraordinary circumstances militating to the contrary, the non-custodial parent will during the periods of visitation have broad authority and discretion with respect to the place and manner of the exercise of same, subject only to the time constrictions found reasonable and placed in the decree.
Id. at 870.
¶ 14. A parent exercising visitation has discretion in determining with whom the child will associate during that visitation. See, e.g., Harrington v. Harrington, 648 So.2d 543 (Miss.1994) (noncustodial father’s cohabitation did not per se warrant restrictions on visitations). A non-custodial parent may determine which extra-curricular activities the child participates in during visitation, including certain activities of which the custodial parent disapproves. See, e.g., Mord v. Peters, 571 So.2d 981 (Miss.1990) (absent any showing that flying with father would be dangerous or that father was acting without concern for children’s well being, neither mother nor court had right to restrict children’s activities during visitation). In short, visitation allows the caretaker extreme latitude in determining how to care for the child, as long as the visitation is within the child’s best interests.
¶ 15. In the case sub judice, the chancellor requires Givens to leave her child with the paternal grandparents in Memphis by 7:00 p.m. on the second Friday of each month. Nicholson may or may not be present during the visit. Because the mother will not have her child returned until Sunday at 6:00 p.m. and because the father may not be able to travel to Memphis, the chancellor has effectively surrendered the child’s care and control to the grandparents during the second weekend of each month when the father is absent. Requiring Givens to relinquish the care, physical custody and control of her child to the grandparents for a period of time is nothing less than visitation.
II. DID THE CHANCELLOR ERR IN GRANTING GRANDPARENT VISITATION?
¶ 16. It is well settled that natural grandparents have no common-law “right” to visitation with their grandchildren. Such right, if any, must come from a legislative enactment. In re Adoption of a Minor, 558 So.2d 854, 856 (Miss.1990) (citing Olson v. Flinn, 484 So.2d 1015, 1017 (Miss.1986)). In 1983 the Mississippi Legislature enacted the grandparents’ visitation rights statutes, found at Mississippi Code Annotated Section 93-16-1 to 7 (Rev. 1994). These statutes outline how a grandparent may seek the opportunity to secure visitation with a child.
¶ 17. Although a grandparent has standing to petition for visitation, a natural grandparent’s statutory right to visit her grandchild is not as comprehensive as a parent’s visitation rights. Settle v. Galloway, 682 So.2d 1032, 1035 (Miss.1996). As always, the best interests of the child are the paramount consideration when determining visitation. Morgan v. West, 812 So.2d 987(¶ 13) (Miss.2002). In Martin v. *1077 Coop, 693 So.2d 912, 916 (Miss.1997), the Mississippi Supreme Court listed ten factors which should be considered in determining grandparent visitation. The factors are as follows:
(1) The amount of disruption that extensive visitation will have on the child’s life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.
(2) The suitability of the grandparents’ home with respect to the amount of supervision received by the child.
(3) The age of the child.
(4) The age, and physical and mental health of the grandparents.
(5) The emotional ties between the grandparents and the grandchild.
(6) The moral fitness of the grandparents.
(7) The distance of the grandparents’ home from the child’s home.
(8) Any undermining of the parent’s general discipline of the child.
(9) Employment of the grandparents and the responsibilities associated with that employment.
(10) The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent’s manner of child rearing is not to be interfered with by the grandparents.
Id. The Martin court acknowledged that this list was not all-inclusive, and stated that the chancellor should weigh “all circumstances and factors he feels to be appropriate.” Id.
¶ 18. In the case sub judice the chancellor committed error at two points. First, the grandparents did not petition the court for visitation as provided for in Mississippi Code Annotated Section 93-16-3 (Rev. 1994). The grandparents were never parties to the litigation, and they never sought visitation from the court. Second, the chancellor heard no evidence concerning the grandparents as required under Martin. There was no testimony regarding the grandparents’ fitness, character, home life, emotional ties to the child, employment or even their desire to care for the child in the event Nicholson is unable to make the monthly trek to Memphis.
¶ 19. Although this Court understands and appreciates that contact with extended family may be of great benefit to a child, the Legislature has clearly outlined the steps a grandparent should take to pursue visitation. This is in no way a denial of the grandparents’ ability to seek visitation, which may be pursued by a separate process if they so desire. Furthermore, because the child’s best interest is the fundamental concern, a chancellor must review all relevant factors as outlined in Martin before granting grandparent visitation. The Martin requirements provide more than a mere formality; they protect the interests of the parents, the grandparents, and, most importantly, the child. Accordingly, the chancellor erred in granting visitation to the grandparents.
¶ 20. THE JUDGMENT OF THE CHANCERY COURT OF UNION COUNTY IS AFFIRMED IN PART AND REVERSED AND RENDERED IN PART. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPEL-LEE.
KING, C.J., BRIDGES AND SOUTHWICK, P.JJ., MYERS, CHANDLER AND GRIFFIS, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT A SEPARATE WRITTEN OPINION.