# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CT-00040-SCT

*BRANDON SMITH AND KIMBERLY WOLFE*
*SMITH*

*v.*

*MILTON MARTIN AND GENEVA MARTIN*

## ON WRIT OF CERTIORARI

DATE OF JUDGMENT:           05/16/2013
TRIAL JUDGE:                HON. JANACE H. GOREE
TRIAL COURT ATTORNEYS:      GEORGE S. WHITTEN, JR.
                            TOM P. CALHOUN, III
                            JAMES H. POWELL, III
COURT FROM WHICH APPEALED:  YAZOO COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS:   GEORGE S. WHITTEN, JR.
                            TOM P. CALHOUN, III
ATTORNEYS FOR APPELLEES:    JAMES H. POWELL, III
                            SABRINA D. HOWELL
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                AFFIRMED - 04/20/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**KITCHENS, JUSTICE, FOR THE COURT:**

¶1.     Milton and Geneva Martin sought grandparent visitation with their two grandsons

after they were denied visitation by Kimberly and Brandon Smith, the children's biological

mother and adoptive father. Marty Martin, the children's father and the Martins' son, is

deceased. The Chancery Court of Yazoo County granted grandparent visitation to the

Martins, the Smiths appealed, and the case was assigned to the Mississippi Court of Appeals,

which affirmed. We granted the Smiths' petition for a writ of *certiorari*. We affirm the judgment of the Mississippi Court of Appeals and the judgment of the Chancery Court of Yazoo County.

## FACTS AND PROCEDURAL HISTORY

¶2.    The following facts are taken, verbatim, from the decision of the Mississippi Court of Appeals:

> Kimberly and Marty Martin married in 1996 and divorced in 2003. The couple had two minor children. The couple's first son, Cliff,[1] was born in 2001. Their second son, Hank, was born in 2004 after the entry of the divorce decree. Kimberly received physical custody of the two children, and Marty received visitation supervised by his parents, the Martins.
>
> On February 8, 2008, Marty committed suicide. His body was discovered at his home on the Martins' property while the two children were present for their visitation with him. Marty's mother, Geneva, testified that the children never saw their father's body but viewed the emergency personnel who responded to the situation. Following Marty's death, Kimberly allowed the Martins to continue visitation with the children as they had prior to Marty's death. The Martins' visitation included weekend visits, overnight visits, and a week of visitation around Christmas. At one point, Kimberly was hospitalized after she suffered a nervous breakdown. During this time, the Martins provided full-time care for at least one of Kimberly's children while Kimberly recovered.
>
> On May 17, 2008, Kimberly married Brandon [Smith]. In 2010, Brandon adopted Kimberly's children. Following an incident on January 2, 2011, Kimberly and Brandon discontinued the Martins' visitation with the two minor children. Geneva and Kimberly both testified about the incident on January 2, 2011. The women both testified that the two children were visiting the Martins when Hank became ill. Geneva and Kimberly arranged to meet so that Hank could return home. Kimberly decided that Cliff should return home at the same time.

---

[1] In reference to the minor children, we apply the pseudonyms employed by the parties, as did the Mississippi Court of Appeals. We refer to the eldest son of Marty and Kimberly as Cliff, and we refer to the youngest son of Marty and Kimberly as Hank.

Geneva testified that, upon learning that he had to go home early, Cliff grew upset and began to cry. Geneva further testified that, upon arriving at the exchange location, she instructed the children to get inside Kimberly's car while she spoke to Kimberly. Geneva told Kimberly that Cliff had accused Brandon of the following: being mean to Cliff, telling Cliff he was overweight and needed Jenny Craig, and pulling Cliff's hair and arms until they hurt.

At this point in the story, the two women's accounts of events differed. According to Kimberly, during the conversation, Geneva would sob hysterically, compose herself, and then continue sobbing. Kimberly testified that Cliff, who witnessed the women's conversation from inside Kimberly's car, jumped from Kimberly's car, ran to Geneva's car, and locked himself inside. Kimberly further testified that, as he ran toward Geneva's car, Cliff yelled, "You were right, Grandmother. My life would be better if I just lived with you and went to school at Carroll Academy."

Geneva, however, disputed Kimberly's version of events. According to Geneva's testimony, she and Kimberly both remained composed during the conversation. Geneva admitted that, when Kimberly raised her voice at one point during the conversation, Cliff exited Kimberly's car, hugged Geneva, and then ran to Geneva's car. Geneva testified, though, that Cliff never yelled anything as he ran to her car and that he never locked himself inside her car.

On redirect, Kimberly testified that Cliff remained upset the entire drive home after the events on January 2, 2011. Even after arriving home, Kimberly stated that Cliff remained inconsolable. During her redirect, Kimberly testified as follows:

> [Cliff] was hysterically telling me that I had lied to him, that his grandmother had told him I had lied to him his whole life; that I had divorced his daddy for no good reason, taken him away from [Marty]; [that Marty] got sadder and sadder, sicker and sicker until he died. That Brandon would never be his daddy, Brandon didn't love him; that Grandmother said [Brandon] would never love him because he wasn't [Brandon's] real child, [the adoption] was just a piece of paper; [Brandon] had no right to discipline him. He kept on and on telling me that I had lied to him, I had lied to him his whole life about this divorce. He told Brandon his grandmother said she would hire an attorney and sue us to have his name changed back to Martin.

Because Cliff remained inconsolable and refused to believe anything they told him, the Smiths asked other family members to explain to Cliff the kind of man his father, Marty, had been and to explain why Kimberly had divorced Marty. The Smiths testified that they were reluctant to take this course of action but believed it was the only way to help Cliff calm down. During a proffer, Kimberly testified that she, Brandon, her two older sons, her mother, and her aunt all spoke to Cliff. The family members explained to Cliff that Marty had experienced an ongoing drug problem; Marty had beaten Kimberly; and Kimberly had divorced Marty because she was afraid for her safety and Cliff's safety. During her direct examination, Kimberly testified that Cliff eventually calmed down after speaking to the other family members. However, because she and Brandon remained concerned, they made an appointment for a psychologist to evaluate Cliff and Hank.

Kimberly further testified that she ended the Martins' visitation with the children due in part to the events on January 2, 2011. Kimberly testified that she and Brandon also ended the visitation because they had observed a change in the children's behavior following their visits with the Martins. According to Kimberly, the children acted more aggressively and disrespectfully after visiting the Martins. Both Kimberly and Brandon testified that Cliff even attempted to shoot Brandon with a BB gun in July 2010. Due to the cumulative effect of these incidents, the Smiths decided it was in the children's best interests to deny the Martins further visitation.

On August 3, 2011, the Martins filed a petition for grandparent visitation pursuant to Mississippi Code Annotated section 93-16-3(2) (Rev. 2013). On August 9, 2011, the Martins filed a motion for temporary visitation. Following a hearing on the Martins' motion for temporary visitation, the chancellor entered an order granting temporary visitation. The chancellor's order granted the Martins telephone visitation up to two times a week between 5:30 p.m. and 9 p.m. In addition, the chancellor granted the Martins physical visitation with the children for five hours on December 28, 2011, which was to be supervised by a mutual friend of the parties.

On May 16, 2013, following a two-day hearing, the chancellor entered an order finding that the Martins were entitled to visitation under Mississippi Code Annotated [S]ection 93-16-3(1) (Rev. 2013). Because the Martins filed their petition under [S]ection 93-16-3(2) [(Rev. 2013)], however, the chancellor also discussed whether the Martins satisfied the criteria for grandparent visitation under that subsection of the statute. The chancellor determined that an award of grandparent visitation was also appropriate under [S]ection 93-16-3(2) since the Martins established the following: (1) a viable

relationship existed with the children; (2) the Smiths unreasonably denied visitation; and (3) visitation was in the children's best interests. *See* Miss. Code Ann. § 93-16-3(2). Although the Smiths testified that they denied visitation for behavior-related reasons, the chancellor found no causal connection between the children's behavior and their visits with the Martins.

After determining that the Martins were entitled to visitation under both section 93-16-3(1) and section 93-16-3(2), the chancellor considered the *Martin*[2] factors. After considering the factors, the chancellor found: (1) limited visitation would not be too disruptive to the children's lives; (2) the Martins' activities posed no barrier to their ability to provide a suitable home with sufficient supervision when the children visited; (3) the children were ages eleven and nine at the time of the hearing; (4) the Martins, both in their sixties, appeared to be in good health at the time of the hearing even though Geneva had suffered a nervous breakdown after Marty's suicide and Milton had experienced stress due to his son's death and Geneva's breakdown; (5) strong emotional ties existed between the Martins and the children; (6) no evidence was offered to prove that the Martins were morally unfit to have a relationship with the children; (7) the Martins' home in Carroll County was not too far from the Smiths' home in Yazoo County; (8) although the Smiths alleged that the Martins undermined their general discipline of the children, they failed to offer any evidence to substantiate their claims; (9) the Martins' employment responsibilities would not interfere with visitation; and (10) the Martins testified that they were willing to accept that rearing the children was the Smiths' responsibility, and they testified that they would do nothing to interfere with that.

The chancellor concluded that it was in the children's best interests to award grandparent-visitation rights to the Martins. The chancellor therefore granted the Martins visitation with the children on the third weekend of every month. The chancellor also ordered the Smiths, the Martins, and the children to attend family counseling to facilitate a smooth visitation experience between the Martins and the children. In addition, the chancellor ordered that the family counseling would continue until the counselor determined the need for counseling no longer existed.

Following the chancellor's order, the Smiths filed an unsuccessful motion for a new trial. The Smiths asserted in their motion that the chancellor had erroneously excluded evidence and conducted the hearing in a manner

---

[2] *Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997).

5

pervasively prejudicial to them. Aggrieved by the chancellor's grant of visitation and denial of their new-trial motion, the Smiths appeal.

***Smith v. Martin***, 202 So. 3d 263, 265-68 (Miss. Ct. App. 2016).

¶3. The Court of Appeals affirmed. We granted *certiorari* to clarify the applicable standards in light of the Smiths' argument that the chancellor applied an erroneous legal standard by requiring them to satisfy a heightened burden of proof.

## STANDARD OF REVIEW

¶4. "Findings of a chancellor will not be disturbed on review unless the chancellor was 'manifestly wrong, clearly erroneous, or applied the wrong legal standard.'" ***Heiter v. Heiter***, 192 So. 3d 992, 994 (Miss. 2016) (quoting ***Powell v. Campbell***, 912 So. 2d 978, 981 (Miss. 2005)).

## DISCUSSION

¶5. Mississippi Code Section 93-16-3 provides, in pertinent part, the following:

(1) Whenever a court of this state enters a decree or order awarding custody of a minor child to one (1) of the parents of the child or terminating the parental rights of one (1) of the parents of a minor child, or whenever one (1) of the parents of a minor child dies, either parent of the child's parents may petition the court in which the decree or order was rendered or, in the case of the death of a parent, petition the chancery court in the county in which the child resides, and seek visitation rights with the child.

(2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:

(a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and

6

(b) That visitation rights of the grandparent with the child would be in the best interests of the child.

(3) For purposes of subsection (2) of this section, the term "viable relationship" means a relationship in which the grandparents or either of them have voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months before filing any petition for visitation rights with the child, the grandparents have had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year, or the child has been cared for by the grandparents or either of them over a significant period of time during the time the parent has been in jail or on military duty that necessitates the absence of the parent from the home.

Miss. Code Ann. § 93-16-3(1), (2), (3) (Rev. 2013).

¶6.    This Court has established the following factors for consideration by the chancery court in determining grandparent visitation, no one factor being "weighed more heavily than the others:"

1.    The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.

2.    The suitability of the grandparents' home with respect to the amount of supervision received by the child.

3.    The age of the child.

4.    The age, and physical and mental health of the grandparents.

5.    The emotional ties between the grandparents and the grandchild.

6.    The moral fitness of the grandparents.

7.    The distance of the grandparents' home from the child's home.

7

8.       Any undermining of the parent's general discipline of the child.

9.       Employment of the grandparents and the responsibilities associated with that employment.

10.      The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.

***Martin v. Coop***, 693 So. 2d 912, 916 (Miss. 1997). The Court clarified that "[t]hese factors are . . . not all-inclusive" and that "[t]he chancellor should weigh all circumstances and factors he feels to be appropriate." ***Id.***

¶7.      The chancellor carefully analyzed Sections 93-16-3(1) and (2) and each ***Martin*** factor in her written order granting grandparent visitation rights to the Martins. On *certiorari*, the Smiths, however, take issue with various statements made by the chancellor at the hearing, which, they claim, indicate that the chancellor misunderstood that the grandparents bear the burden of proof and that she expected the Smiths (the parents) to prove that grandparent visitation was not in the children's best interests.

¶8.      The chancellor stated the following during Smiths' lawyer's cross examination of Milton Martin:

> Okay. Now I'm giving you-all some latitude here, a lot. But for you to, but I need you to tie this together. Now it wouldn't take a rocket scientist to realize that these people having lost a son due to suicide is gone [sic] be stressed out some. But unless you can show me how it's going to make them incapable of exercising grandparent visitation it's a waste of my time.

The colloquy with the Smiths' lawyer continued:

> THE COURT:      And you-all don't have but one day here and maybe we need to come together and see if one day is enough time, because you haven't gotten finished with the first two

witnesses and I don't know how many more you have. But this line of questioning, and I've allowed you to spend a good bit of time, but the question, you know, to say that they were not emotionally and even the children ought to be emotionally affected by the loss of their father. I mean this is life. But, you know, you got to show me that it interferes with their ability to be grandparents and have grandparent visitation.

MR. CALHOUN: Well Your Honor the relevancy we see is one of the *Martin v. Coop* – one of the primary factors we say is the mental health of the grandparents here. And so we're exploring that.

. . .

THE COURT: That's why I'm giving you some latitude. But I'm just explaining to you that I'm about to -- you're getting near to the end of my patience because I want it to tie together to whether they are incapable of visiting with the children because of some emotional problem that they have, mental problem that they have.

During the Smiths' counsel's direct examination of Kimberly Smith, the chancellor stated: "We're going to finish this trial today and I'm going to hear those things that will give me something for a basis for which I could say either these people pose a threat to the child, these children visitation, now or that they don't." She continued: "I want to hear what will help me make a decision today as to whether these people [the Martins] pose a threat to these children."

¶9.     The Smiths urge in their petition for writ of *certiorari* that the chancellor's statements conflict with *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). In that case, the United States Supreme Court affirmed a judgment of the Washington Supreme Court invalidating a state statute which provided that "'[a]ny person may petition the court

9

for visitation rights at any time including, but not limited to, custody proceedings.'" ***Troxel***, 530 U.S. at 61, 75.

¶10.    The mother of two children had restricted the children's paternal grandparents' visitation to "one short visit per month" following the father's suicide. ***Id.*** at 60-61. The grandparents sought visitation pursuant to the visitation statute, and the Washington Superior Court for Skagit County granted their petition, finding grandparent visitation to be in the best interests of the children. ***Id.*** at 61-62. The Washington Supreme Court reversed, finding that the statute "unconstitutionally infringes on the fundamental right of parents to rear their children." ***Id.*** at 63. A majority of the United States Supreme Court agreed that the judgment of the Washington Supreme Court should be affirmed. ***Id.*** at 75-79.

¶11.    A plurality[3] of the United States Supreme Court noted that the superior court had given "no special weight at all to [the mother's] determination of her daughters' best interests" and that "it appears that the Superior Court applied exactly the opposite presumption." ***Id.*** at 69. The superior court had stated that:

---

[3] The plurality opinion was authored by Justice O'Connor and was joined by Chief Justice Rehnquist, Justice Ginsburg, and Justice Breyer. Justice Souter concurred in the judgment, writing that he agreed with "affirming the decision of the Supreme Court of Washington, whose facial invalidation of its own state statute is consistent with this Court's prior cases addressing the susbtantive issue at stake," but that he "would say no more." ***Troxell***, 530 U.S. at 75 (Souter, J., concurring in the judgment). Justice Thomas also concurred in the judgment, writing that he agreed "with the plurality that this Court's recognition of a fundamental right of parents to direct the upbringing of their children resolves this case," but would have added that he "would apply strict scrutiny to infringement of fundamental rights" and that the State of Washington "lacks even a legitimate governmental interest—to say nothing of a compelling one—in second guessing a fit parent's decision regarding visitation with third parties." ***Troxel***, 530 U.S. at 80 (Thomas, J., dissenting). Justices Stevens, Scalia, and Kennedy filed dissenting opinions.

The burden is to show that it is in the best interest of the children to have some visitation and some quality time with their grandparents. I think in most situations a commonsensical approach [is that] it is normally in the best interest of the children to spend quality time with the grandparent, unless the grandparent, [sic] there are some issues or problems involved wherein the grandparents, their lifestyles are going to impact adversely upon the children. That certainly isn't the case here from what I can tell.

*Id.* According to the plurality, the judge had said that he had not "'been shown [that visitation] is not in [the] best interest of the children.'" *Id.* The plurality observed that "[t]he judge's comments suggest that he presumed the grandparent's request should be granted unless the children would be 'impact[ed] adversely.' In effect, the judge placed on [the mother], the fit custodial parent, the burden of disproving that visitation would be in the best interest of her daughters." *Id.*

¶12. In their petition for a writ of *certiorari*, the Smiths compare the statements of the chancellor in this case to those of the trial judge in *Troxell*:

[T]o compound her error of placing the burden of proof upon the parents, the chancellor demanded that the parents' evidence surpass merely disproving that grandparent visitation would be in the best interests of the children, and that their evidence meet a higher standard of proving that the grandparents either were incapable of hosting the children for visits or would pose a threat to the children.

The Smiths correctly relate that the chancellor informed their lawyer at the hearing that he had to show that the Martins were "incapable of exercising grandparent visitation," that their son's death "interfere[d] with their ability to be grandparents and have grandparent visitation," and that "they are incapable of visiting with the children because of some emotional problem that they have, mental problem that they have." The chancellor also challenged the parents' attorney to adduce testimony that would enable her "to hear what will

11

help me make a decision today as to whether these people [the Martins] pose a threat to these children." The chancellor further said to the Smiths' lawyer, "I want to hear if there's any reason for which I ought not to allow these grandparents to visit." When the Smiths' counsel was questioning the children's mother, the chancellor stated that "hopefully the questions that you're going to ask her is going to line up with the burden of proof that have to be, the specific codes require your proof to engender and support."

¶13.    In *Martin v. Coop*, the chancellor had granted visitation rights to paternal grandparents whose son, the child's father, was deceased. *Martin*, 693 So. 2d at 914. This Court held that because the chancellor had "found that under [Section 93-16-3(1)] the petitioners are in fact the grandparents of Jesse and that their son is deceased" and therefore, "all the proof necessary under § 93-16-3(1) was present and . . . the grandparents should be awarded visitation." *Id.* Likewise here, the chancellor found that the Martins were the grandparents of Cliff and Hank, and the Martin's son, the father of Cliff and Hank, is deceased. Under the *Martin* analysis, therefore, the Martins in this case are *entitled* to grandparent visitation rights and the chancellor needed only apply the *Martin* factors in order to "determine the *amount* of visitation that grandparents should be granted in this situation . . . ." *Id.* at 916 (emphasis added). The chancellor in the present case, once determining that grandparent visitation was appropriate under Sections 93-16-3(1) and (2),[4] applied the

---

[4] The chancellor noted that she was "aware that if subsection (1) of the Miss. Code Ann. 93-16-3(1) applies, then subsection (2) need not be considered in determining whether the Martins have a right to petition for grandparent visitations," but that "since the Martins petitioned the court to proceed under subsection (2) of the Grandparent's visitation statute, this court will address that subsection (2) in its opinion." She found both that the Martins had established a viable relationship with Cliff and Hank and that visitation with the

*Martin* factors to "determine the appropriate visitations that the grandparents should exercise with their grandchildren."

¶14.    As the Smiths argue, the *Martin* Court did not take into account Mississippi Code Section 93-16-5, which states that the chancery court "may, in its discretion, if it finds that such visitation rights would be in the best interest of the child, grant to a grandparent reasonable visitation rights with the child." Miss. Code Ann. § 93-16-5 (Rev. 2013). Section 93-16-5 obligates the chancellor to consider the best interest of the child(ren), even if the statutory elements of Section 93-16-3(1) are met. This Court has held that "[n]atural grandparents have no common-law 'right' of visitation with their grandchildren. Such right must come from a legislative enactment." *Settle v. Galloway*, 682 So. 2d 1032, 1035 (Miss. 1996) (citing *Matter of Adoption of a Minor*, 558 So. 2d 854, 856 (Miss. 1990)). "Although the Mississippi Legislature created this right by enacting § 93-16-3, it is clear that natural grandparents do not have a right to visit their grandchildren that is as comprehensive to the rights of a parent." *Settle*, 682 So. 2d at 1035.

¶15.    The *Martin* Court erred by instructing chancellors to consider the best interest of the child(ren) only in the context of the *amount* of visitation, after finding an entitlement to grandparent visitation under Section 93-16-3(1). *See Martin*, 693 So. 2d at 916 ("The chancellor in this case found that under [Section 93-16-3(1)] the petitioners are in fact the grandparents of [the child] and that their son is deceased. Thus, all the proof necessary under § 93-16-3(1) was present and, therefore, the grandparents should be awarded visitation.")

_____

grandparents was in the best interest of both children.

The *Martin* Court ignored the requirement of Section 93-16-5 that the best interest of the child(ren) be considered in determining the grandparents' entitlement to grandparent visitation rights. The *Martin* Court stated the following: "In determining the *amount* of visitation that grandparents should be granted in this situation, some guidelines by this Court may be helpful. As always, the best interest of the child must be the polestar consideration." *Id.* (emphasis added). But, under Section 93-16-5, the best interest of the child(ren) must be considered, even if Section 93-16-3(1) is found to apply, since Section 93-16-3(1) states that "either parent of the child's parent may *petition* the court . . . and *seek* visitation rights with the child." Miss. Code Ann. § 93-16-3(1) (emphasis added). Section 93-16-3(1) only permits the grandparents to seek visitation; it does not *entitle* them to receive it.

¶16.    We have reversed a chancellor's award of grandparent visitation where "[t]here is no indication from the chancellor's statement, or anywhere else in the record, that the best interests of [the child] were considered by the chancellor in making her decision." *Morgan v. West*, 812 So. 2d 987, 992 (Miss. 2002). This Court observed that the chancellor appeared to have been "more concerned with the best interests" of the grandmother because she found:

> "from prior testimony and testimony presented today that this grandmother was relied upon during the hard times, and at the present time the parents want to push her aside and treat her as an outsider. It is obvious to the Court they want to break the relationship between the grandchild and the grandmother . . . ."

*Id.*

¶17.    The Mississippi Court of Appeals likewise has reversed a chancellor's award of grandparent visitation, noting that "the Legislature has outlined the steps a grandparent should take to pursue visitation" and that "because the child's best interest is the fundamental

14

concern, a chancellor must review all relevant factors as outlined in *Martin* before granting grandparent visitation." ***Givens v. Nicholson***, 878 So. 2d 1073, 1077 (Miss. Ct. App. 2004).

¶18.     We clarify that, under Section 93-16-3(1), the chancellor's consideration of the child's or children's best interest is not limited to the determination of the *amount* of visitation, but must be considered in determining *whether* the grandparents should receive visitation in the first place. The Smiths contend that the chancellor's statements at the hearing indicate that she expected the Smiths, in order for them to prevail, to prove that the mental and emotional health of the Martins rendered them incapable of exercising grandparent visitation and that the Martins posed a threat to Cliff and Hank. But our review of the record leads us to conclude that the chancellor carefully analyzed Sections 93-16-3(1) and (2) and scrupulously weighed each *Martin* factor, thereby performing the correct analytical process and properly applying the right procedural, evidentiary, and statutory principles. This process led her to a fair and just resolution of a difficult and emotional case. The present case greatly differs from those in which this Court has deemed reversal the only appropriate remedy. *See Morgan*, 812 So. 2d at 992 (This Court reversed because the chancellor had not considered the best interest of the child at all and "the chancellor did not articulate her findings regarding the *Martin* factors . . . .") Here, we can identify no manifest error which would warrant reversal, and the record before us is clear that the paramount consideration supporting the chancellor's decision was the best interest of the children.

## CONCLUSION

¶19. Finding no manifest error in the chancellor's grant of grandparent visitation rights to the Martins, we affirm the judgment of the Mississippi Court of Appeals and the judgment of the Chancery Court of Yazoo County.

¶20. **AFFIRMED.**

      **WALLER, C.J., DICKINSON AND RANDOLPH, P.JJ., KING, COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR.**