# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00569-COA

**MICHAEL HUTSON**                                           **APPELLANT**

**v.**

**JACOB HUTSON AND THERESA HUTSON**              **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/25/2022 |
| TRIALS JUDGE: | HON. JOHN C. McLAURIN JR. |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | JOHN HOLADAY |
| ATTORNEY FOR APPELLEES: | MARY JUDITH BARNETT |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 10/03/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND McDONALD, JJ.**

**WESTBROOKS, J., FOR THE COURT**:

¶1. On November 25, 2019, Michael Hutson unsuccessfully petitioned for grandparent visitation of Jane[1] against her natural parents, Jacob and Theresa Hutson ("Hutsons"), pursuant to Mississippi Code Annotated section 93-16-3(2) (Supp. 2019). When a grandparent petitions for grandparent visitation under this section, the chancellor must first consider whether: (1) the grandparent and the child have an established viable relationship; (2) the parent or custodian of the child has unreasonably denied the grandparent visitation, and (3) it is in the best interest of the child to have visitation with the grandparent. Miss. Code Ann. § 93-16-3(2); *accord Stacy v. Ross*, 798 So. 2d 1275, 1279 (¶17) (Miss. 2001).

---

[1] To protect the identity of the minor, we use a pseudonym.

¶2.     In April 2021, the chancellor held a hearing on Michael's petition for grandparent visitation. At the close of the hearing, the Hutsons moved to dismiss the action under Rule 41(b).[2] On May 19, 2021, the chancellor dismissed Michael's petition because he found that while Michael undoubtedly had a viable relationship with Jane, the Hutsons were justified in denying him grandparent visitation. The chancellor reasoned that Michael's behavior exhibited vindictiveness, childishness, and selfishness and served to derogate the Hutsons' authority. The chancellor further found that it was not in Jane's best interest to have a relationship with Michael.

¶3.     On June 1, 2021, Michael moved to amend the findings or the judgment and for a new trial. M.R.C.P. 52(b) & 59(a), (e). Michael asserted that the chancellor's ruling was not supported by the evidence. On November 9, 2021, the Hutsons moved for attorney's fees. The Hutsons cited the Rule 41(b) as their cause for not bringing the matter of attorney's fees to the court's attention at an earlier date. M.R.C.P. 41(b).

¶4.     On May 10, 2022, the chancellor held a hearing on the motions. During the hearing, the chancellor stated that he had reviewed his prior ruling on the issue and had found no cause to alter his ruling. Therefore, the chancellor denied Michael's motions. In regard to the attorney's fees, the chancellor found that the Hutsons were not able to pay the attorney's fees in the amount of $8,317.07 and ordered Michael to pay the Hutsons' attorney's fees within thirty days.

---

[2] "After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. . . ." M.R.C.P. 41(b).

¶5.  Michael appeals the dismissal of his claim and the chancellor's order requiring him to pay attorney's fees.  We affirm the chancellor's dismissal and order of attorney's fees.

**FACTS AND PROCEDURAL HISTORY**

¶6.  Jacob Hutson and Theresa Hutson live in Pearl, Mississippi.  They married in May 2016 and have three children.  The two oldest children are Jacob's step-children.  The youngest child, Jane, is Jacob's natural daughter.

¶7.  This case is about the best interest of Jane.  In November 2019, Jane's grandfather, Michael Charles Hutson Sr., petitioned for court-ordered grandparent visitation with Jane.  Jane's paternal grandparents are Sandra Hutson (deceased), who is Jacob's natural mother, and Michael Hutson, who is Jacob's natural father.  In 2016, Michael married Robin Hutson Jane's step-grandmother.

¶8.  Michael worked for Cypress Farms and Kennels for over twenty years.  He tended to their "hunting camp" in Canton, Mississippi.  As the property manager, he was responsible for maintaining everything in the camp.

¶9.  When Jane was born in 2013, Michael was living at a residence provided by his employer in Canton, which he called the "Farm."  Sometimes the family would come to the Farm to fish, hunt, or visit.  Other times, Michael would go to Pearl to visit Jane in daycare or see Jane at the Hutsons' home.  He moved to a home in Pearl that was less than three miles away from the Hutsons so he could visit Jane more often.

¶10.  From the moment Jane was born, Michael was in her life and was privileged to have frequent visitations with her.  In September 2019, however, the Hutsons no longer allowed

3

Michael and Robin to spend time with Jane because they felt that visitation was not in Jane's or their family's best interest.

¶11. On November 25, 2019, Michael filed a petition for grandparent visitation against the Hutsons for unreasonably denying him visitation with Jane. On April 6 and 7, 2021, the chancellor held a hearing on Michael's petition for grandparent visitation. The Hutsons, the grandparents (Robin and Michael), Michael's brother, Timothy Hutson, and Robin's mother, Marie Elise Rush, testified at the hearing.

¶12. There is some discrepancy in the testimonies regarding the exact dates that certain events occurred in August and September 2019. But the consensus is that the events following the July 29, 2019 meeting in totality are what led to Jacob denying Michael's visitation. As a result, the following breakdown of the parties' testimonies has been fashioned in a manner that best exemplifies the events leading to the denial of visitation.

### A. Theresa Hutson

¶13. In July 2019, Theresa Hutson took her children to the Memphis Zoo. On July 27, 2019, Robin asked Theresa if Jane could "come over and swim." On July 29, 2019, all three children went over to Robin's mother's house for a swim. Theresa testified that when the children returned home later that day, her eldest daughter expressed to her that she was upset about something that had happened at Robin's mother's house that day.

¶14. Theresa was not allowed to testify to the contents of what her oldest daughter told her. But Theresa did testify that in response to what her daughter said, she told Jacob a serious conversation needed to be had with his parents about "disciplining [their] children, raising

[their] children, [and] what morals [they] want[ed] [their] children to have." Theresa further testified that she had told Jacob that if he did not have this conversation with his parents, then she did not feel that her children would be "mentally" safe with his parents.

¶15. The same night, Michael and Robin came to the Hutsons' house to have a meeting. The children were not present. Theresa testified that she asked Michael if he loved her children. He responded, "Do you want me to be honest?" She said, "Yes." Michael responded, "No. They're not my grandchildren." Theresa asked, "What did my children ever do to you?" In response, Michael gave an example by telling Theresa that her eldest daughter told him he was not her grandfather when he tried to discipline her.

¶16. Theresa explained that Michael had never said anything about this alleged statement but that it did not justify his treatment toward her eldest daughter. She testified that she had apologized to Michael for his feeling that way because she "did not want [her] children to be around people that pretend[ed] to love them." Theresa testified that she had further explained to Michael and Robin that she "did not appreciate the way that they [gave] - - focus[ed] all of their attention on just [Jane] in front of the other children." And that if they were choosing to have different degrees of relationship with the children, then it did not need to be so obvious or "as excessive as it [was]."

¶17. Theresa said that she did not want Jane, Michael, and Robin to sleep in the bed together, and that for years she had told them not to do so. In addition, Theresa testified that Michael and Robin gave Jane melatonin drops, which she believed were unsafe for her children. Theresa testified that she had very clearly told them that there would be "no more

5

visitation[s]."

**B.    Jacob Hutson**

¶18.    On or about August 11, 2019, Jacob allowed Michael to visit with Jane at Michael's house for about two hours.  Afterward, Jacob testified that he denied his father visitation because he was showing "signs of craziness."  In sum, Jacob said that Michael came by his house and was stealing stuff from him.

¶19.    On or about August 19, 2019, Michael showed up where Jacob worked.  Jacob said that Michael was ranting at him at his office, stating that he (Michael) was "going to make sure that [he] [was] never going to have somewhere to hunt."  Jacob also stated that Michael had told him that he (Jacob) was going to have to get his stuff from the Farm and that he (Jacob) was not going to be able to keep Jane away from him (Michael).  Jacob further testified that Michael was cursing, being irate, and telling Jacob that he (Michael) was going to destroy Jacob's "duck blind."  Jacob testified that he had told Michael that the conversation was inappropriate and that Michael was acting like a child.

¶20.    Later that day, Michael showed up at Jacob's house in a vehicle with a trailer attached. Michael had at least "two elk heads and a caribou head" on the trailer.  Jacob said that his father had been hanging out the window and driving up and down the street.  Jacob testified that Michael had been laughing and said, "Hey, this is me acting like a child."

¶21.    Jacob testified that he had filed criminal charges against Michael in Madison County for allegedly stealing his guns and deer heads.  Jacob testified that he knew Michael had stolen his guns because Michael had been telling him that if Jacob let Michael see Jane, then

6

he would get his guns back. Jacob also stated that Michael had promised certain guns to Theresa's eldest son but later said that her son was not his grandchild. But Jacob did not know whether the charges had been pursued or dismissed.

¶22. Jacob stated that he saw the look in his father's eyes when he showed up at his workplace and at his home. Jacob said that it reminded him of the look he saw in Michael's eyes when Jacob was a child. He stated that he knew something was wrong with his father because had only seen that look in his father's eyes one time before: "when he beat my mama."

¶23. Jacob stated that his father began acting "crazier and crazier" because "he was not getting what he wanted." Jacob said that in September 2019, Michael visited Jane's school three times "without permission." Then, Jacob removed Michael from the school's list of authorized persons.

¶24. In December 2019, Michael went to Jane's school Christmas pageant. Jacob testified that while there, Michael was attempting to antagonize them. Jacob testified that Michael and Robin walked up to him and Theresa and stood next to them. Michael was laughing and said to Jacob, "Ha, ha, ha, ha, ha, ha. You didn't think I could be here? It's a public event." Jacob testified that a Pearl police officer who was on duty that night "got involved" to "diffuse the episode."

¶25. Jacob said that he was denying Michael visitations because of the "unhealthy relationship . . . as a whole." Jacob also testified that Michael was unfairly treating his children. As an example, he stated that it would not be fair to his family for Michael to

"bring eight Christmas presents over, give this one six and these two."  Jacob expounded:

> This is - - this is my family. When I married my wife, Theresa Hutson, I accepted a responsibility to be the parents of these kids for the rest of my life until I die.  I mean, that's my job as a father figure to these children as a man, in my eyes, that I have to stand up for my kids.  My kids are hurting.

### C.    Timothy Hutson

¶26.    Timothy Stewart Hutson Sr. is Michael's older brother, and he testified about Michael's relationship with Jane and Jacob's reasons for not allowing Michael to visit with Jane.  Timothy was impressed with the relationship Michael had with Jane and that he had the time and energy to give to the relationship.  But Timothy also recalled that Jacob did not want Michael around Jane because Jacob believed that Michael "was becoming senile and he didn't really trust him around [Jane]."  Timothy also testified, however, that he did not know what Jacob was talking about.  On cross-examination, Timothy testified Jacob had told him that he believed Michael was a danger to his children.  Timothy was asked whether he was aware of the incident when Michael drove up and down Jacob and Theresa's residential street with Jacob's "animal heads" on the trailer behind his truck.  He replied that he knew about it.

### D.    Marie Elise Rush

¶27.    Marie Elise Rush ("Penny"), is Robin's mother and is the next-door neighbor of Robin and Michael.  She stated that Michael had a good relationship with Jane and Theresa's other two children.  She further stated that over the years, the children frequently came over to her house to swim.  During cross-examination, Penny testified that there was only one bedroom designated for Jane and that when the other two children came over, one could sleep in the

room with Jane, but the other would have to sleep on the couch. Penny also confirmed that Michael had bought a Corvette for Jane and told her that he specifically bought it for her.

### E. Robin Hutson

¶28. Robin's testimony reflects that she and Theresa had communicated about what Theresa did and did not want Robin and Michael to do in regard to Jane. Robin had more than one conversation with Theresa about Jane sleeping "with them in their bed," but to her knowledge, Theresa had not told her that Jane could not sleep in their bed with them. Robin admitted that she had given Jane medication that had melatonin to help with her cough. But once Theresa told her that the medication contained melatonin, she never gave Jane that medication again.

¶29. From Robin's point of view, the July 29, 2019 meeting was about Theresa needing to address her about Theresa's eldest daughter. Robin said that Theresa had relayed to her that the oldest daughter's feelings had been hurt and that Theresa was not happy about it because every time her daughter came to Robin and Michael's house she returned with her feelings hurt. Robin testified she was told that if she and Michael could not treat the "children equally, [then] [they] couldn't see any of them." Robin also confirmed that Michael had stated at the July 29, 2019 meeting that the two older children were not his grandchildren and that he did not love them.

¶30. On or about August 30, 2019, Robin went to Theresa's place of work because she could not understand why she and Michael could not see Jane. Robin testified that she realized after her meeting with Theresa that she was not going to be able to get anywhere.

9

¶31.    After Robin met with Theresa, Michael and Robin decided to visit Jane at her school three times: on September 4, September 10, and September 12.  Shortly after, Jacob took Michael and Robin off the school's list.  As for the December 2019 pageant, Robin said that she and Michael did not speak to the Hutsons and were not approached by the police.

### F.    Michael Hutson

¶32.    Michael testified that he would pick Jane up from daycare whenever Jacob and Theresa needed and would spend time with her on the swing hanging on the tree in his front yard.  Michael also testified that at least once a month, Jane would spend a night at his house.  When she slept over, he conceded that Jane would sleep in the bed with him and Robin.

¶33.    Michael testified that he never heard Jacob or Robin say that Theresa did not want Jane sleeping with him and Robin.  Michael also said that he never gave Jane melatonin.  He testified that he was not aware of Robin giving Jane melatonin either.  Shortly thereafter, Michael testified that because Theresa was a nurse, he would not give Jane any medication without calling Theresa first or without her authority.  Next, Michael further testified that it was not his job to discipline Jane.  If there was ever a serious problem, then he would call Jacob and Theresa.  Michel stated that he did not give Jane corporal punishment or yell or curse at her in any way.

¶34.    When it came to Theresa's eldest children, Michael testified very clearly that "this may sound horrible to y'all, but they're not my grandchildren."  Michael acknowledged that when he lived at the Farm, Theresa's children would come over to fish and hunt.  Michael claimed he did not spend a lot of time with them.  Michael said Theresa's children had "other

10

grandparents," and they would go to Theresa's mother's house.

¶35. Michael admitted that he had gone to Jacob's place of employment. He stated that he walked into Jacob's place of work with a mounted duck in his hand. He said, "This is yours. There's a lot more of these in my house out there. It's time for you to get them out."

¶36. Michael also admitted that he had popped up at Jacob's house with the trailer. In his version of the incident, he did not drive "up and down the street." He told Jacob, "I brought your animals to you." Jacob responded by cursing at him. Michael replied, "I'm acting like a child, I guess." The court asked Michael to explain why he decided on that particular day to take the duck to Jacob's employment so soon after they had the July 29, 2019 meeting. Michael responded, "I don't know. It just was my prerogative to do so, I guess."

¶37. The Hutsons moved for a dismissal of Michael's petition under Rule 41(b), which the court granted. The chancellor found that Michael had not shown that the Hutsons had unreasonably denied him visitation with Jane. The chancellor also found that it was not in Jane's best interest to grant Michael's petition and award him the requested visitation.

¶38. Michael moved for the chancellor to amend his findings and judgment. Later, the Hutsons moved for Michael to pay their attorney's fees. The chancellor held a hearing on the motions. The chancellor denied Michael's motions and ordered him to pay the Hutsons' attorney's fees. Michael appeals.

**STANDARD OF REVIEW**

¶39. "Findings of a chancellor will not be disturbed on review unless the chancellor was manifestly wrong, clearly erroneous, or applied the wrong legal standard." *Smith v. Martin*,

11

222 So. 3d 255, 259 (¶4) (Miss. 2017) (quoting *Heiter v. Heiter*, 192 So. 3d 992, 994 (¶4) (Miss. 2016); *Powell v. Campbell*, 912 So. 2d 978, 981 (¶8) (Miss. 2005)). "In matters that are questions of law, this Court employs a de novo standard of review and will only reverse for an erroneous interpretation or application of the law." *Morgan v. West*, 812 So. 2d 987, 990 (¶8) (Miss. 2002).

## DISCUSSION

¶40. The chancellor dismissed Michael Hutson's petition for paternal grandparent visitation of Jane, after finding that the Hutsons had not unreasonably denied Michael visitation. The chancellor based his findings on the testimony presented at the April 6 and 7, 2021 hearing. The core issue before us is whether the chancellor manifestly erred by finding that the Hutsons' denial of visitation was reasonable.

### A. Whether the court erred by finding that the Hutsons did not unreasonably deny Michael Hutson visitation.

¶41. Section 93-16-3(2) entitles a natural grandparent to grandparent visitation when the "grandparent has shown (1) that a "viable relationship" with his or her grandchild has been established, (2) that visitation with the grandchild has been unreasonably denied by the grandchild's parent, and (3) that visitation is in the best interest of the grandchild." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013); *accord* Miss. Code Ann. § 93-16-3(2).

¶42. Michael argues that the chancellor based his finding (that the Hutsons did not unreasonably deny Michael visitation) on nonexistent facts, misrepresentations of the record, or, cherry-picked evidence. But "[t]he determination [of] whether parents are unreasonable

12

in denying visitation in whole or in part to grandparents is not a contest between equals. *Stacy*, 798 So. 2d at 1280 (¶23). "Parents with custody have a paramount right to control the environment, physical, social, and emotional, to which their children are exposed." *Id*. "Whether it is beneficial to a child to have a relationship with a grandparent in any specific case, therefore, in the first instance is a decision for the parent to make, and when it becomes subject to judicial review, 'the court must accord at least some special weight to the parent's own determination.'" *Id.* at (¶19) (quoting *Troxel v. Granville*, 530 U.S. 57, 70 (2000)).

¶43.  As further explained in *Stacy*:

> Interference with that right based upon anything less than compelling circumstances is not the intent of the visitation statute. Clearly, forced, extensive unsupervised visitation cannot be ordered absent compelling circumstances which suggest something near unfitness of the custodial parents.

*Id.*

¶44.  Moreover, the chancellor is the fact-finder.  The chancellor's "assessment of witness credibility lies within his sole province." *Greers v. Akers*, 364 So. 3d 662, 670 (¶22) (Miss. Ct. App. 2021) (quoting *Darnell v. Darnell*, 234 So. 3d 421, 424 (¶8) (Miss. 2017)).  "Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Id.* (quoting *Bowen v. Bowen*, 982 So. 2d 385, 395 (¶42) (Miss. 2008)).

¶45.  Here, we affirm the chancellor's ruling.  We presume that parents know what is in the best interest of their child.  Both Jacob and Theresa testified that Michael's favoritism toward Jane over their other children was causing problems in their family and emotionally harming

Theresa's two other children. There was testimony that when all the children were at Michael's house, Jane would be allowed to do things that the two other children were not allowed to do. There was also testimony that the grandparents would provide more for Jane financially and would support Jane's extracurricular activities more than the other children to the extent that Theresa's older children noticed the difference.

¶46. Based on the evidence in the record, we conclude that the chancellor's decision was not clearly erroneous. The factual question before the chancellor was one of reasonableness and, based on the testimony from the Hutsons (a majority of which Robin did not contradict), the chancellor found that the Hutsons acted reasonably. We find no reversible error.

**B.** **Whether the court erred by (1) failing to conduct a proper analysis of the *Martin* factors and by failing to make specific findings of fact; or (2) by failing to properly consider and find that grandparent visitation was in the best interest of the child.**

¶47. Michael argues that the chancellor failed to conduct a proper *Martin* analysis and failed to properly consider whether the grandparent visitation was in the best interest of Jane. *Martin*, 222 So. 3d at 260 (¶6) (listing factors for court to weigh when deciding grandparent visitation). But it was Michael's burden to first show that the Hutsons had unreasonably denied him visitation with Jane. *Aydelott*, 124 So. 3d at 101 (¶11). Because the chancellor found that the Hutsons had not been unreasonable in denying visitation, he was under no obligation to consider the *Martin* factors. *Keasler v. Fowler*, 308 So. 3d 441, 444 (¶17) (Miss. Ct. App. 2020) ("[A]n analysis of *Martin* is not required when a grandparent fails to satisfy the criteria set forth in section 93-16-3." (citing *Vermillion v. Perkett*, 281 So. 3d 925, 929 (¶21) (Miss. Ct. App. 2019))); *Hillman v. Vance*, 910 So. 2d 43, 47 (¶11) (Miss. Ct. App.

14

2005). When a grandparent has not evidenced that he is entitled to an award of grandparent visitation pursuant to section 93-16-3(2), the chancellor need not consider whether awarding grandparent visitation is in the best interest of the child. *Vermillion*, 281 So. 3d at 932 (¶21).

¶48.  In any event, the chancellor found that it was not in the best interest of Jane to visit with Michael and Robin, because Michael was causing a disruption between Jane and Theresa's two eldest children. Jacob and Theresa made it a requirement for Michael to treat all the children the same, and Michael refused to do so. The chancellor did not make any clear or manifest error here.

**C.     Whether the court erred by improperly weighing the evidence.**

¶49.  Michael argues that the chancellor improperly weighed the evidence. As discussed above, the chancellor had the authority to determine the credibility of each witness's testimony. "This Court will not substitute its judgment for that of the chancellor even if this Court disagrees with the lower court on the finding of fact and might arrive at a different conclusion." *Sanderson v. Sanderson*, 170 So. 3d 430, 434 (¶13) (Miss. 2014) (internal quotation marks omitted). And given that appellate courts do not hear the testimony in real time, absent a showing of clear error, *Altom v. Jones*, 209 So. 3d 434, 437 (¶9) (Miss. Ct. App. 2016), we will adhere to the chancellor's decision.

¶50.  Natural parents and grandparents are not on equal footing. "The law presumes natural parents will love their children most and will act in accordance with their children's best interests." *In re Adoption of J.J.G.*, 736 So. 2d 1037, 1040 (¶19) (Miss. 1999) (citing Miss. Code Ann. § 93-13-1 (Rev. 1994)); *accord Stacy*, 798 So. 2d at 1279 (¶18). This

15

presumption applies in all cases unless it is rebutted by clear and convincing evidence that the natural parents are unfit. *Wilson v. Davis*, 181 So. 3d 991, 995 (¶7) (Miss. 2016) (citing *Moody v. Moody*, 211 So. 2d 842, 844 (Miss. 1968)); *Davis v. Vaughn*, 126 So. 3d 33, 37 (¶10) (Miss. 2013). Since no testimony in this case indicated that the Hutsons were unfit, the chancellor had the authority and discretion to give more weight to the Hutsons' testimony rather than Michael's testimony. *See Altom*, 209 So. 3d at 437 (¶9) ("[C]hancellors have the ultimate discretion to weigh evidence."); *see also Summers v. Gros*, 319 So. 3d 479, 487 (¶26) (Miss. 2021) (quoting Miss. Code Ann. § 93-5-24(1)(e) (Rev. 2018)); *Garner v. Garner*, 283 So. 3d 120, 129 (¶20) (Miss. 2019). The chancellor did not clearly err.

### D. Whether the court improperly took control of witness testimony or improperly interfered with the hearing.

¶51. Mississippi Rule of Evidence 614(b) states that "[t]he court may examine a witness regardless of who calls the witness." A chancellor has broad to interrogate witnesses because "the chancellor is both judge and jury." *Griffin v. State*, 171 Miss. 70, 156 So. 652, 653 (1934). The chancellor has an "undoubted right" to question witnesses when "for the purpose of developing the truth of the matter at issue." *Id.* This right may be implemented when witnesses are "stubborn, or extremely partisan" or give "confused" testimony "in a fog," especially "[when] counsel either fails to clear it up with reasonable promptness or, as often happens, adds to the confusion by a confused course of examination." *Id.*

¶52. Michael argues that the chancellor became an advocate for the Hutsons and directed their testimony and that the chancellor allowed opposing counsel to mention facts not in evidence. This argument is wholly without merit. The chancellor properly examined the

16

adverse witnesses (Jacob and Theresa) when Michael's counsel confused them or was not able to succinctly question them. When the parties did not comply with our Rules of Evidence, the chancellor properly disregarded the evidence.

### E. Whether the court erred by failing to grant Michael Hutson's motions under Mississippi Rules of Civil Procedure 52 and 59(e).

¶53. Michael argues that the chancellor erred by denying his Rule 52 and Rule 59(e) motions. We disagree. "In order to succeed on a Rule 59(e) motion, the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice." *Aaron v. Aaron*, 147 So. 3d 370, 373 (¶9) (Miss. Ct. App. 2014) (referencing M.R.C.P. 59(e)). Michael has not shown that any of the three circumstances apply in this case.

¶54. Next, Rule 52(b) grants the chancellor discretion to determine whether the court should amend or make additional findings. M.R.C.P. 52(b). In this case, the chancellor determined that his ruling remained unchanged. It was unnecessary for the chancellor to grant this motion when he had made specific findings of fact in the bench ruling and attached those findings to his order dismissing the action. Michael's arguments here lack merit.

### F. Whether the court erred by awarding the Hutsons attorney's fees.

¶55. It is within the chancellor's discretion to determine whether to order the grandparents to pay reasonable attorney's fees to the parents or to find that the parents will incur no financial hardship. *Vermillion*, 281 So. 3d at 933 (¶26). We will reverse the ruling if the chancellor abused his discretion. *Morgan*, 812 So. 2d at 997 (¶37).

¶56. Michael argues that the chancellor erred by awarding the Hutson's attorney's fees

because the Hutsons did not file a motion for attorney's fees prior to the hearing on Michael's petition for grandparent visitation. We disagree. In this case, we conclude that the chancellor did not abuse his discretion by awarding attorney's fees to the Hutsons.

¶57. Pursuant to section 93-16-3(4) parents may seek attorney's fees from grandparents:

> Upon a showing of financial hardship for the parents, the court shall on motion of the parent or parents direct the grandparents to pay reasonable attorney's fees to the parent or parents at any time, including before a hearing, without regard to the outcome of the petition.

Miss. Code Ann. § 93-16-3(4). In 2019, the Legislature amended section 93-16-3(4) to reflect that a parent may motion for an award of attorney's fees "at any time." 2019 Miss. Laws ch. 404, §1 (H.B. 1096). We interpret this change in language to mean that, unlike the more restrictive language "in advance and prior to any hearing" as written in Mississippi Code Annotated section 93-16-3(4) (Rev. 2018), parents may now move for attorney's fees before, during, or after the hearing on a grandparent's petition for visitation. This issue is without merit.

## CONCLUSION

¶58. The chancellor's order dismissing Michael's petition for grandparent visitation rights is affirmed. The chancellor did not make any clear error in finding that the Hutsons acted reasonably in withholding visitation from Michael. Nor did the chancellor err by ordering Michael to pay the Hutsons attorney's fees. We affirm the chancellor's judgment.

¶59. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

18