*6 GRIFFIS, J.,
for the Court.
¶ 1. Pamela L. Ferguson (“Pamela”) appeals the decision of the Hinds County Chancery Court which granted her mother, Juanita H. Lewis, visitation rights with Pamela’s fifteen-year-old daughter, Kathryn.[1] Feeling aggrieved by this decision, Pamela appeals and asserts that: (1) the chancellor’s decision granting visitation rights to Lewis is against the overwhelming weight of the evidence; (2) the chancellor abused his discretion in awarding Lewis overnight visitation rights and by disregarding Kathryn’s wishes; and (3) the chancellor erred in concluding that Pamela had unreasonably denied Lewis visitation with Kathryn. Finding no error, we affirm.
FACTS
¶ 2. Kathryn was born on May 20, 1993, and resides with her natural mother, Pamela, in Madison, Mississippi.[2] On August 29, 2007, Lewis filed a petition with the chancery court for grandparents’ visitation rights pursuant to Mississippi Code Annotated section 93-16-3(2) (Rev.2004). Thereafter, a hearing was held on the matter.
¶ 3. Lewis testified that she and Kathryn had a close relationship when Kathryn was younger and that Kathryn and Pamela even lived with her for a short while following the death of Kathryn’s father. Lewis stated that Kathryn often spent the night at her house and that Pamela brought Kathryn to visit her approximately once a week.
¶ 4. According to Lewis, she purchased a home for Pamela and Kathryn in August 2006. The home was located across the street from Lewis’s home. Lewis recalled that when Pamela and Kathryn first moved across the street, her relationship with Kathryn was good and that Kathryn visited her daily. Further, Lewis testified that she often sent food to Pamela and Kathryn. Lewis stated that her relationship with Pamela changed shortly after Christmas 2006. Lewis went to Pamela’s house to retrieve her dishes that had accumulated at Pamela’s house, but when she arrived, Pamela would not allow her to enter. Pamela instructed Kathryn to “get back.” Lewis testified that Pamela threatened to call the police if she did not leave. Lewis recalled that from that point forward, Pamela cut off all communication with her.
¶ 5. Lewis also testified about an incident that occurred when she approached Kathryn at the mailbox outside of Kathryn’s home. Lewis apologized to Kathryn for not seeing her, and she told Kathryn that Pamela would not allow them to see each other because Pamela suffers from a mental illness.[3] According to Lewis, Kathryn was not surprised upon hearing that Pamela was mentally ill. Sometime after this encounter, Pamela and Kathryn decided to move. Lewis stated that Pamela refused to tell her where they were moving, so she found out from one of the movers.
¶ 6. Pamela testified that she does not suffer from bipolar disorder and that she never told Lewis that she does. Pamela stated that she and Lewis have a history of conflict and that things escalated after Christmas 2006. Pamela said that shortly *7 before Christmas 2006, when she was ill with bronchitis, Lewis called her five or six times in one day. Pamela stated that during one conversation, Lewis accused her of being mentally ill and stated that she never wanted to speak to her again. Pamela testified that she then informed Lewis that she would no longer allow her to control her life. Pamela also testified that she refused to allow Lewis to have contact with Kathryn from that point forward. Pamela further testified that “Momma has had a pattern, if she can’t control, she’s out to destroy. Pve seen her do it with my sister, with Rebecca, [and] with Sam.[4] And, you know, I just decided I’m 45 years old and I don’t have to go through this.” (Footnote added).
¶ 7. Pamela also testified that Kathryn has been on an emotional roller coaster ever since the mailbox encounter with Lewis, even though at one point Kathryn and Lewis had a close relationship. She testified that she does not feel that it is in Kathryn’s best interest to have visitation with Lewis because of the emotional toll that contact with Lewis has on Kathryn.
¶ 8. According to Kathryn, Pamela and Lewis have a history of conflict. Kathryn explained that on one particular occasion when she and Pamela lived across the street from Lewis, they refused to allow Lewis to enter their home and Lewis attempted to force her way in. After she failed to gain entry, she threatened to call the police. Kathryn testified that she told Lewis that day that she did not want anything else to do with her.
¶ 9. Kathryn also testified about the mailbox incident. According to Kathryn, while she was checking the mail, Lewis approached and informed her that Pamela was mentally ill. Kathryn recalled Lewis asking her if she wanted Lewis to take Pamela to a doctor. Kathryn testified that she told Lewis that she did not.
¶ 10. Kathryn was also examined substantially by the chancellor. During this examination, Kathryn stated that she does not feel comfortable staying overnight at her grandmother’s home. She stated that this is partly because of the incident when Lewis attempted to force her way into their home.
¶ 11. Following the hearing, the chancellor, against Kathryn’s wishes,[5] awarded Lewis visitation, including overnight visitation. It is from this decision that Pamela now appeals.
STANDARD OF REVIEW
¶ 12. We employ a limited standard of review in reviewing a chancellor’s decision. Stacy v. Ross, 798 So.2d 1275, 1278(¶ 13) (Miss.2001). Therefore, we will not reverse a chancellor’s findings unless the record indicates that “the chancellor abused his discretion, was manifestly wrong, or made a finding which was clearly erroneous.” Id. (citing Bank of Miss. v. Hollingsworth, 609 So.2d 422, 424 (Miss.1992)). However, an appellate court reviews questions of law de novo. Id. (citing Zeman v. Stanford, 789 So.2d 798, 802(¶ 12) (Miss.2001)).
ANALYSIS

Whether there is substantial evidence to support the chancellor’s decision granting Lewis visitation rights with Kathryn.

*8 ¶ 13. Pamela raises three issues that are interrelated, as each of them challenge the appropriateness of the chancellor’s grant of visitation rights to Lewis. Therefore, we recast the issues as one: whether there is substantial evidence to support the chancellor’s decision granting Lewis visitation rights with Kathryn.[6]
¶ 14. The Mississippi Legislature has determined that a chancery court may “grant visitation rights with a minor child ... to the grandparents of such minor child[.]” Miss. Code Ann. § 93-16-1 (Supp.2008). Mississippi Code Annotated section 93-16-3(2) and (3) (Rev.2004) provides:
(2) Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:
(a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and
(b) That visitation rights of the grandparent with the child would be in the best interests of the child.
(3) For purposes of subsection (3) of this section, the term “viable relationship” means a relationship in which the grandparents or either of them have voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months before filing any petition for visitation rights with the child or the grandparents have had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year.
Mississippi Code Annotated section 93-16-5 (Supp.2008) provides, in pertinent part, that:
... the court may, in its discretion, if it finds that such visitation rights would be in the best interest of the child, grant to a grandparent reasonable visitation rights with the child. Whenever visitation rights are granted to a grandparent, the court may issue such orders as shall be necessary to enforce such rights and may modify or terminate such visitation rights for cause at any time.
(Emphasis added).
¶ 15. According to section 93-16-5, the chancellor has discretion to award a grandparent visitation rights. Here, the chancellor did just that. The chancellor heard testimony, considered all the evidence offered, evaluated the demeanor or credibility of the witnesses, and then decided that Lewis should be given visitation rights.
¶ 16. Pamela argues that the chancellor did not conduct a proper analysis of the factors set out by the Mississippi Supreme Court in Martin v. Coop, 693 So.2d 912, 916 (Miss.1997). In Martin, the supreme court announced factors that should be considered by chancellors when determining whether to grant grandparents’ visitation rights:
1. The amount of disruption that extensive visitation will have on the child’s life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the *9 natural parent and the child as a result of the child being away from home for extensive lengths of time.
2. The suitability of the grandparents’ home with respect to the amount of supervision received by the child.
3. The age of the child.
4. The age, and physical and mental health of the grandparents.
5. The emotional ties between the grandparents and the grandchild.
6. The moral fitness of the grandparents.
7. The distance of the grandparents’ home from the child’s home.
8. Any undermining of the parent’s general discipline of the child.
9. Employment of the grandparents and the responsibilities associated with that employment.
10.The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent’s manner of child rearing is not to be interfered with by the grandparents.

Id.

¶ 17. Upon our review of the record, we find that the chancellor thoroughly analyzed each factor. The chancellor, in pertinent part, opined:
Juanita is Pamela’s seventy-four-year-old natural mother, and [Kathryn], Pamela’s fourteen-year-old daughter, is the subject of the relief requested. The [c]ourt took the testimony of five witnesses, including the parties, [Kathryn], Juanita’s brother Shelton Holiday, and Rebecca Vaught, another of Juanita’s grandchildren and [Kathryn]’s first cousin.
After living in the Jackson area from the time [Kathryn] was about three years of age, Pamela moved across the street from her mother, Juanita, in Raymond, Mississippi, in approximately November 2006, shortly after Pamela’s father died. Everyone agrees that Juanita purchased the home for Pamela at a cost of over $200,000. The evidence is clear that, while the parties lived in such close proximity, [Kathryn] visited Juanita’s house almost every day; however, the close proximity of the parties proved to be a considerable obstacle to their relationship, and shortly after Christmas 2006, Pamela refused to have anything to do with her mother and withheld [Kathryn]’s society from her as well. The record is not at all clear about what specific incident led to the breakdown in communication. Juanita testified that it followed an incident in which Pamela was very rude to her and that Pamela just froze her out of contact with her and [Kathryn] from that point on.
Everyone also agrees that [Kathryn] was, and is, the apple of Juanita’s eye, and all parties acknowledge that they love each other very much. Pamela and [Kathryn] both say that Juanita is a very controlling woman, although there was very little clear and specific evidence in the testimony illustrative on this point. Juanita testified that she believed that Pamela is bipolar, though Pamela denies ever having been so diagnosed. In September 2007, Pamela abruptly sold the house Juanita had purchased for her and moved to Madison, Mississippi, refusing to tell Juanita where she and [Kathryn] were moving. Feeling aggrieved, Juanita says that she decided to ask for at least some portion of her money back from the sale of the house in Raymond, but that Pamela refused.
The [c]ourt took the testimony of [Kathryn] on the record in chambers. [Kathryn] was articulate and engaging for a *10 child her age, though the [c]ourt noted from her testimony that she was very much under the emotional and psychological influence of her mother, Pamela, almost to the point of being able to be said to have been brainwashed. Though she repeatedly expressed the belief that Juanita was attempting to control and undermine her mother and herself, she was not able to cite more than a couple of rather minor specific instances of behavior that led her to that conclusion. [Kathryn] expressed concern that Juanita’s soul needed “salvation,” although Juanita had testified that she was an active member of the Raymond United Methodist Church. There can be no other explanation for the child’s belief in this regard than that Pamela had inculcated her with such a dubious notion. The circumstances here present [sic] certainly seem to fit the requirements set forth in Section 93-16-3(2) and (3), Mississippi Code [Annotated] of 1972, as amended, and in Martin v. Coop, 693 So.2d 912 (Miss.1997). There is no question that Juanita has established a viable relationship with [Kathryn], and the record is simply devoid of sufficient evidence of any contributory conduct by Juanita to justify Pamela’s withholding of [Kathryn]’s company. The evidence shows that Juanita and her late husband, Pamela’s father, have financially supported Pamela for much of [Kathryn]’s life. They bought her vehicles and a house valued at over $200,000. The [c]ourt specifically finds, then, that Pamela’s conduct in denying Juanita the opportunity to see and visit with [Kathryn] constitutes an unreasonable denial and is not in [Kathryn]’s best interest. The Mississippi Supreme Court has outlined, in Martin, a number of factors for this [c]ourt to consider in weighing the evidence taken on a grandparent visitation matter. A review of those factors in this case more than supports a finding by this [c]ourt that Juanita’s rights should be enforced pursuant to the statute:
1. Amount of disruption extensive visitation will have on grandchild’s life. Juanita and Pamela both live in the metropolitan Jackson area. [Kathryn] is home-schooled and Pamela does not work, so [hers] and Pamela’s schedules are far more flexible than the average person’s. Even if extensive visitation was being requested, it would appear that such would not be difficult to arrange; however, Juanita testified that she would be satisfied if [Kathryn] was allowed to visit in the summer and at Christmas.
2. Suitability of grandparent’s home with respect to amount of supervision received by grandchild. Juanita lives alone in a large house in Raymond, Mississippi surrounded by acreage and the product of her hobby of growing flowers. [Kathryn] has spent many hours there and testified that she enjoyed riding with Juanita in her Club Car around the premises. Juanita testified that [Kathryn] has her own room at her house, and a cabinet in which she keeps the things with which she enjoys playing. [Kathryn] also indicated that she very much liked to visit with her “Uncle Shelton Lee,” Juanita’s brother who visits Juanita’s house every day. There is nothing about Juanita’s home that from the evidence would indicate it is not a completely suitable place for [Kathryn] to visit or that Juanita would not be available and expected to oversee such visits to whatever extent was required.
3. Age of grandchild. At fourteen (14) years of age, [Kathryn] is at a perfectly suitable age to visit a grand *11 parent. She needs no special attention, and Juanita is healthy and active and capable of providing for her what she needs.
4. Age and physical and mental health of grandparents. As already observed, Juanita is physically capable of providing for [Kathryn]’s needs when the child is at her home for visitation. Pamela alleged that Juanita is controlling and intrusive in her business, and the testimony seemed to indicate that Juanita had a somewhat difficult relationship with other family members. However, the evidence is simply not sufficient to conclude that Juanita lacks sufficient mental health and stability to visit with, love, and care of her grandchild.
5. Emotional ties between grandparents and grandchild. The emotional ties between Juanita and [Kathryn] were apparently closer at points prior to the trial of this matter. However, [Kathryn] admitted that she had visited regularly in Juanita’s home and that she enjoyed such visits. This [c]ourt believes that whatever strains in that relationship now exist are largely the result of Pamela’s efforts to pit herself and [Kathryn] against Juanita and to recruit [Kathryn] to her side in that battle. As a young and impressionable child and lacking mature independent judgment herself, it is understandable that [Kathryn] would adopt her mother’s attitude. None of that acts to undo in so short a time the considerable emotional ties between Juanita and [Kathryn] which existed prior to the most recent split between Juanita and Pamela.
6. Moral fitness of grandparents. No allegation was made that Juanita is not morally fit to exercise her rights to visit with her grandchild, and no evidence of such was received or detected by the [c]ourt.
7. Distance of grandparents’home from grandchild’s home. As has been noted hereinabove, Pamela and [Kathryn] live in the Jackson metropolitan area, as does Juanita. This factor should not be considered a detriment in any way to visitation between Juanita and [Kathryn],
8. Any undermining of parent’s general discipline of grandchild. There was no testimony or other evidence that Juanita has undermined or attempted to undermine Pamela’s discipline of [Kathryn]. Juanita acknowledged on cross-examination that she knew that Pamela did not allow [Kathryn] to watch television and that [Kathryn] had been allowed to watch some television while at her house. Such does not, however, constitute an interference with Pamela’s general discipline, especially when Juanita testified further that she attempted to oversee such activity and to limit [Kathryn’s viewing to only those type of shows of which she believed Pamela would approve.
9. Employment of grandparents and responsibilities associated with it. Juanita does not work, and this factor does not pose a problem with the exercise of her visitation with [Kathryn].
10. Willingness of grandparents to accept that rearing of [a] child is parent’s responsibility and that parent’s manner of childrearing is not to be interfered with. As mentioned above, Pamela and Juanita disagree on some aspects of child rearing, one of which is the child’s opportunity to watch television. Although Juanita acknowledged letting [Kathryn] watch some TV, she did make reference to *12 her attempts to censor the specific shows the child watched. Juanita also testified that she thought it would be best if [Kathryn] was exposed to other children her age by attending a more traditional school setting; however, no evidence was received to indicate that she interfered in Pamela’s decision to home-school [Kathryn], There was simply no evidence that Juanita has made any real efforts to interfere with Pamela’s parental autonomy.
On balance, it seems to the [c]ourt that Pamela is hyper-sensitive to Juanita’s differing opinions and need for frequent contact with her and [Kathryn], An honest discussion of these problems with Juanita, in the proper setting, would have been a better way of addressing such sensitivity rather than simply pulling up stakes and fleeing. Pamela owes much to Juanita and Juanita’s deceased husband, Pamela’s father. Juanita has extensive family in the Raymond, Mississippi ] area, including [Kathryn]’s aunts, uncles, and cousins. The [e]ourt finds that it is in [Kathryn]’s best interest that she maintain contact with this family and with Juanita, and Juanita’s petition is well taken on the evidence adduced at trial and is granted.
At the conclusion of the trial, the [c]ourt granted Juanita’s request for temporary relief and required [Kathryn] and Pamela to go out to eat with Juanita and Juanita’s brother, Shelton, on the third Saturday of each month. The [c]ourt believes that for the time being that schedule is a good one to reestablish the trust in these relationships. However, as part of the permanent relief granted herein, the [c]ourt would add to that schedule the following: 1) [Kathryn] is to be delivered by Pamela to Juanita’s residence by 4:00 p.m. on Christmas Eve each year, and [Kathryn] may be picked up from such visitation (in the event Pamela chooses not to stay) at 8:00 p.m.; and 2) [Kathryn] is to be delivered by Pamela to Juanita’s residence by 6:00 p.m. on the second Saturday of June of each year and on the second Saturday of July each year, and allowed to visit for a period of one week on each such occasion, unless Juanita and Pamela agree on different weeks during the summer, or at another point in the year.
¶ 18. The chancellor’s opinion accurately discussed the testimony that was offered. It is clear that the chancellor considered the testimony of both Kathryn and Pamela. However, the chancellor determined that it was in Kathryn’s best interest to attempt to have a relationship with her grandmother.
¶ 19. Each member of this Court, if he or she had served as the chancellor, may have reached a different decision based on the facts presented. The difficulty here is compounded because the chancellor’s decision requires a teenager to do that which she apparently does not want to do. It is often said that chancellors must have the wisdom of Solomon in domestic cases. It may also be said that chancellors must have much more wisdom than Solomon when dealing with teenagers. The chancellor here did not have a magic wand, and he was not gifted with the ability to mend “family fences.” However, it is clear that the chancellor did what he thought was in the best interest of the child. The fact that we may have reached a different result does not support a reversal of the chancellor’s decision. This Court did not have the benefit of looking at the witnesses, considering the interaction of the parties and witnesses, and considering the demeanor or credibility of the parties and the witnesses. In this case, we are reluctant to reverse the chancellor who was present and saw and smelled the “smoke of battle.”
*13 ¶ 20. We conclude that this matter was within the discretion of the chancellor. Miss.Code Ann. § 93-16-5. The chancellor’s discretion was broad, and this Court will not disturb the chancellor’s findings unless the chancellor was manifestly wrong, abused his discretion, or applied an erroneous legal standard. Andrews v. Williams, 723 So.2d 1175, 1177(¶ 7) (Miss.Ct.App.1998) (citing Sandlin v. Sandlin, 699 So.2d 1198, 1203 (Miss.1997)). Based on the evidence presented, we cannot find that the chancellor was manifestly wrong, abused his discretion, or applied an erroneous legal standard. Glass v. Glass, 726 So.2d 1281, 1284(¶ 11) (Miss.Ct.App.1998). Accordingly, the chancellor’s judgment is affirmed.
¶ 21. THE JUDGMENT OF THE HINDS COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., MYERS, P.J., BARNES, ISHEE AND MAXWELL, JJ„ CONCUR. IRVING, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY LEE, P.J., AND ROBERTS, J. CARLTON, J., NOT PARTICIPATING.

.To protect the identity of the minor child, she will be referred to by the fictitious name, “Kathryn.” Kathryn was fourteen years old at die time that Lewis was granted visitation rights.

. Kathryn's natural father died when she was a toddler.

. Lewis also stated that Pamela admitted to her that she suffers from bipolar disorder.

. Rebecca and Sam are Lewis’s grandchildren by her daughter, Karen.

. Prior to the examination by tire chancellor, Kathryn testified that she did not want to have visitation with Lewis partly because Lewis often spoke lies about members of their family.

. The dissent also discusses a provision in the chancellor's order that Pamela share a meal with Kathryn and Juanita and concludes that there was no authority for this action. However, neither party raised this matter as an issue for this appeal. Accordingly, we decline to address this matter since it was not asserted as error by either of the parties.