# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00745-COA

**LUTHER GREER AND BRANDI GREER**  APPELLANTS

**v.**

**SANDRA AKERS**  APPELLEE

DATE OF JUDGMENT: 04/24/2019
TRIAL JUDGE: HON. ROBERT Q. WHITWELL
COURT FROM WHICH APPEALED: TIPPAH COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANTS: B. SEAN AKINS
ATTORNEY FOR APPELLEE: L.N. CHANDLER ROGERS
NATURE OF THE CASE: CIVIL - DOMESTIC RELATIONS
DISPOSITION: AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 01/26/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Luke and Brandi Greer appeal from an order granting Brandi's mother, Sandra Akers, grandparent visitation with the Greers' three children. The Greers argue that (1) Sandra failed to establish a "viable relationship" with any of the children as required by the grandparent visitation statute; (2) the chancellor awarded Sandra an excessive amount of visitation; (3) the *Martin* factors, which a chancellor is required to consider before awarding grandparent visitation,[1] are "inadequate" for a case such as this; and (4) the award of visitation with all three children must be reversed because Sandra is not entitled to visitation

---

[1] *See Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997), *abrogated in part on other grounds by Smith v. Martin*, 222 So. 3d 255, 263 (¶15) (Miss. 2017).

with the youngest child. For the reasons discussed below, we affirm the award of visitation as to two of the three children. However, we must reverse and render the award of visitation with the youngest child because Sandra cannot establish a "viable relationship" with that child as required by the grandparent visitation statute.

## FACTS AND PROCEDURAL HISTORY

¶2. Luke and Brandi Greer resided in Senatobia after they were married. Their first daughter, Olivia, was born in 2011. From 2011 to 2014, the Greers lived in Bartlett, Tennessee. Their second daughter, Natalie, was born in 2014. After Natalie was born, the Greers moved to Blue Mountain, where they were closer to Brandi's family, including her mother, Sandra Akers, who lived about fifteen minutes away in New Albany.[2] The Greers' third daughter, Collins, was born in August 2017.

¶3. Prior to June 2018, Sandra maintained a close, loving relationship with her granddaughters. She was present for their births and celebrated many birthdays and holidays with the Greers. When the Greers lived in Senatobia, Sandra would pick up Olivia and take her back to New Albany for visits. When the Greers lived in Bartlett, Sandra regularly visited them and stayed with Olivia while Luke and Brandi went on "date nights." When Natalie was born, Sandra spent the night with Olivia so that Luke could stay with Brandi at the hospital. When Natalie was just ten months old and Olivia was three years old, Sandra

_____

[2] Brandi also has a sister, Calli Broom, and two brothers who live in or near New Albany.

2

kept them both while Luke and Brandi went on a trip to Las Vegas.

¶4. Brandi felt as though she was always "in the middle" of conflicts between Luke and her family. Brandi's family did not like the way that Luke talked to or treated Brandi. They also testified that Luke frequently picked fights with them, including "yelling" and "cussing" at them. Sandra asked Brandi if Luke "was on drugs," which Brandi did not appreciate. Brandi's sister, Calli Broom, testified that they "tolerated" Luke despite his bad behavior. Sandra testified that she "tried to respect" Brandi's decisions and "tried to respect [Luke], as [her] grandchildren's father." But eventually Luke stopped coming with Brandi and their daughters when they went to visit Brandi's family.

¶5. Nevertheless, Sandra became more involved in her granddaughters' lives after the Greers moved to Blue Mountain, which was only fifteen minutes away from Sandra's home, near the end of 2014. Sandra attended Olivia's pageants and softball games. When Brandi ran errands or had doctor's appointments, she relied on Sandra to keep Olivia and Natalie. After Collins was born, Sandra came to see her in the Greers' home and kept her occasionally. Sandra also kept Collins overnight while Collins was sick so that Luke, Brandi, Olivia, and Natalie could go to Alabama for a weekend.

¶6. At trial, Brandi and Luke claimed Sandra rarely visited, only came to a few softball games, and often canceled plans to keep the girls. However, their testimony was contradicted by relatives and family friends who testified that the girls were often with Sandra and spent the night at Sandra's house.

3

¶7.    Luke's issues with Brandi's family came to a head on June 15, 2018. Sandra was keeping Olivia and Natalie because Collins was recovering from a minor medical procedure. Sandra texted Brandi to ask how Collins was feeling. In response, Brandi sent Sandra photos of Collins and asked whether she was ready to bring Olivia and Natalie home or wanted to wait. Sandra said she would bring the girls home later and then took them out to lunch and to run errands. Sandra and the girls returned to Sandra's house around 5 p.m.

¶8.    Around 7 p.m., Sandra had not heard from Brandi, but she did not want to call her and risk waking up Collins. Sandra needed to borrow a pressure washer from a friend, so she decided to take Olivia and Natalie with her and then take them back to the Greers' house. Around 7:15 p.m., Brandi tried to call Sandra, but Sandra was at her friend's house and did not have service on her cell phone.

¶9.    When Sandra realized that Brandi had been trying to call her, she called Brandi back and apologized for worrying her. However, Brandi and Luke both began yelling and cursing at Sandra over the phone. They told Sandra to pull over on the side of the road (a highway) so that they could come get Olivia and Natalie. Sandra responded that she was not going to stop on the side of the highway at night and that they could pick the girls up at her house. In response, Luke said that he was going to call the sheriff's department.

¶10.    Sandra took the girls back to her house. Soon after she arrived home, two sheriff's deputies pulled up in her driveway in separate cars. One of the deputies told Sandra that Luke and Brandi had been to the sheriff's office. Luke and Brandi then arrived, and Luke

4

got out of the car screaming and cursing at Sandra. He continued to scream and curse as he walked into Sandra's house looking for Olivia and Natalie. The deputies stopped Luke and handcuffed him. Brandi then blamed Sandra for Luke's apparent arrest, saying to Olivia and Natalie, "[L]ook what your Mimi has done." Sandra "begged [the deputies] not to take [Luke] to jail because [Olivia and Natalie] were traumatized" and "scared to death" and because she knew the Greers did not have money for bail. The deputies initially insisted on arresting Luke but eventually relented and simply removed him from Sandra's property.

¶11. Luke and Brandi refused to allow Sandra to see her granddaughters after that day. In October 2018, Sandra filed a petition for visitation with her granddaughters in the Tippah County Chancery Court. After a trial, the chancellor found that Sandra had a viable relationship with Olivia, Natalie, and Collins and that visitation was in the girls' best interest. The chancellor awarded Sandra visitation with all three girls for one weekend per month and ten consecutive days in July.[3] Luke and Brandi filed a notice of appeal.

## ANALYSIS

¶12. On appeal, the Greers argue that (1) Sandra failed to establish a "viable relationship" with the children, as required by the grandparent visitation statute, Miss. Code Ann. § 93-16-3(2) (Rev. 2018); (2) the chancellor awarded an excessive amount of visitation; (3) the *Martin* factors are "inadequate" for a case like this one; and (4) the award of visitation with

---

[3] For the first two months, because the girls had not seen Sandra for several months, the chancellor awarded only one-day visits with no overnight visitation.

Olivia and Natalie must be reversed because Sandra is not entitled to visitation with Collins. In addressing these issues, we bear in mind that an award of grandparent "visitation and the restrictions placed upon it are within the discretion of the chancery court." *Martin*, 693 So. 2d at 915 (brackets omitted). We must accept the chancellor's findings "unless he is manifestly wrong or there is clearly an abuse of discretion." *Id.* We review issues of law de novo. *Vermillion v. Perkett*, 281 So. 3d 925, 929 (¶9) (Miss. Ct. App. 2019).

## I. Sandra established a "viable relationship" with Olivia and Natalie but not Collins.

¶13. "There is no common-law right to grandparent visitation. The right is purely statutory and may only be considered if the statutory criteria are met." *Aydelott v. Quartaro*, 124 So. 3d 97, 100 (¶9) (Miss. Ct. App. 2013) (citation omitted). Under Mississippi Code Annotated subsection 93-16-3(2), a chancellor may grant visitation "when a grandparent has shown (1) that a 'viable relationship' with his or her grandchild has been established, (2) that visitation with the grandchild has been unreasonably denied by the grandchild's parent, and (3) that visitation is in the best interest of the grandchild." *Aydelott*, 124 So. 3d at 100 (¶9) (quoting Miss. Code Ann. § 93-16-3(2)).[4] The statute defines a "viable relationship" as

> a relationship in which the grandparent[] . . . ha[s] voluntarily and in good faith supported the child financially in whole or in part for a period of not less

---

[4] Subsection (1) permits a grandparent to petition for visitation if a court has awarded custody to one of the child's parents or terminated the parental rights of one of the child's parents or one of the child's parents has died. Miss. Code Ann. § 93-16-3(1). When, as in this case, none of those circumstances is present, a grandparent may petition for visitation under subsection (2) and must satisfy subsection (2)'s requirements. *Id.* § 93-16-3(2).

6

than six (6) months before filing any petition for visitation rights with the child, the grandparent[] ha[s] had frequent visitation including occasional overnight visitation with said child for a period of not less than one (1) year, or the child has been cared for by the grandparent[] . . . over a significant period of time during the time the parent has been in jail or on military duty that necessitates the absence of the parent from the home.

Miss. Code Ann. § 93-16-3(3). A grandparent must establish a viable relationship with each grandchild at issue. *Aydelott*, 124 So. 3d at 100, 102 (¶¶10, 15).

¶14. In his bench ruling, which he incorporated into the final judgment, the chancellor found that Sandra failed to show that she had supported the children financially for a period of at least six months. Sandra contests that finding on appeal, but the chancellor's finding is not manifestly or clearly erroneous and, therefore, will not be disturbed.[5] In addition, Sandra has not cared for the children while either of their parents was in jail or on military duty.

¶15. Therefore, the decisive issue for purposes of determining whether Sandra had a "viable relationship" with the children is whether there is sufficient evidence to support the chancellor's finding that Sandra established a viable relationship based on "frequent visitation" with each child, "including occasional overnight visitation with [each] child[,] for

---

[5] Sandra had never given the Greers any money to support the girls but testified that she had bought the girls clothes and other items. She also testified that she had "a closet full of clothes for all three girls" that she had not been able to give them because the Greers had denied her visitation. Sandra offered no evidence of the amount of money she had spent on the girls, and Brandi testified that Sandra had only "bought a few things" for them. Based on this evidence, we cannot say that the chancellor clearly or manifestly erred by finding that Sandra failed to prove that she had financially supported the girls.

7

a period of not less than one (1) year." Miss. Code Ann. § 93-16-3(3). We address this issue first with respect to Collins and then with respect to Olivia and Natalie.

### A.    Collins

¶16.    The chancellor correctly recognized that the statute required Sandra "to establish a viable relationship with each grandchild." The chancellor also correctly stated that the fact that a grandparent "wishes to [have] visitation" is not "sufficient to make a viable relationship." *See Aydelott*, 124 So. 3d at 103 (¶21). The chancellor recognized that Collins was only ten months old when Sandra's contact with her ceased in June 2018. The chancellor stated that Collins "had lived the better part of her life up to that point to one year."[6] The chancellor also found that Sandra kept Collins on a number of occasions, though she had only kept her overnight twice. The chancellor ultimately found that Sandra had proved a viable relationship with all three grandchildren.

¶17.    The chancellor clearly erred by finding a viable relationship with Collins because, as relevant in this case, the statute clearly provides that a grandparent must show that she has "had frequent visitation including occasional overnight visitation with [each] child *for a period of not less than one (1) year*." Miss. Code Ann. § 93-16-3(3) (emphasis added). Collins, who was born in August 2017, was not yet one year old when her contact with

___

[6] In his prior ruling denying the Greers' motion for an involuntary dismissal at the close of Sandra's case-in-chief, *see* M.R.C.P. 41(b), the chancellor suggested that a relationship of ten months could constitute "substantial compliance" with statute's requirement of a one-year period.

8

Sandra ceased. Therefore, Sandra clearly did not exercise "frequent visitation" with Collins "for a period of not less than one (1) year." As such, Sandra failed to establish a "viable relationship" with Collins as that term is defined by the statute.

¶18. As stated above, a grandparent's right to visitation "is purely statutory and may *only* be considered if the statutory criteria are met." *Aydelott*, 124 So. 3d at 100 (¶9) (emphasis added). As this Court held in *Aydelott*, "[t]he grandparent-visitation statute is clearly limited to grandparents who can show they *already* had an established viable relationship, which was unreasonably cut-off by the parents." *Id.* at 103 (¶21) (emphasis added). The statute does not permit a court to award visitation "to grandparents who wish they had a viable relationship" with their grandchildren. *Id.*; *see also Vermillion*, 281 So. 3d at 931-32 (¶¶16-19) (holding that a grandparent could not establish a "viable relationship" because the child's parents began denying her visitation before the child was two months old and she had never had overnight visitation with the child). In addition, the statute requires the grandparent to establish a viable relationship with each child at issue. *Aydelott*, 124 So. 3d at 100, 102 (¶¶10, 15).

¶19. Neither the chancellor nor this Court has the authority to rewrite the grandparent visitation statute or carve out exceptions to the mandatory requirements of the statute. *Garner v. Garner*, 283 So. 3d 120, 141 (¶90) (Miss. 2019); *see also, e.g.*, *Watson v. Oppenheim*, 301 So. 3d 37, 41 (¶12) (Miss. 2020) ("In construing any statute, the function of our courts is not to decide what a statute should provide, but to determine what it does

provide." (quotation marks omitted)). In this case, with respect to Collins, Sandra simply did not—indeed, could not—meet the statutory prerequisites to an award of visitation with Collins. Accordingly, we reverse and render the award of visitation with respect to Collins. *Aydelott*, 124 So. 3d at 104 (¶25).

### B. Olivia and Natalie

¶20. The Greers argue the chancellor also erred by finding that Sandra had established a "viable relationship" with Olivia and Natalie—i.e., "frequent visitation including occasional overnight visitation with [Olivia and Natalie] for a period of not less than one (1) year." Miss. Code Ann. § 93-16-3(2). The Greers rely on Brandi's testimony that Sandra did not visit with the girls frequently and rarely exercised overnight visitation with them. The Greers argue that the girls sometimes spent the night with Brandi's sister, Calli, but rarely spent the night with Sandra. Indeed, Brandi claimed that the girls only spent the night with Sandra once in 2017 and once in 2018.

¶21. However, Brandi's testimony on this issue conflicts with the testimony of both Sandra and Calli. Sandra and Calli both testified that Sandra exercised overnight visitation with Olivia and Natalie "many times" throughout the girls' lives. In addition, Sandra and Calli both testified that Olivia and/or Natalie spent the night at Sandra's home five or six times in 2018 (all prior to the incident in June 2018). They testified that on some occasions one of the girls would spend the night at Sandra's house and that the other would spend the night at Calli's house. Indeed, the night before the June 2018 incident, Natalie spent the night with

Sandra, Olivia spent the night with Calli, and Calli brought Olivia to Sandra's house the next morning. Other witnesses also testified that they saw Sandra with the girls frequently, including during overnight visits.

¶22. "[T]his Court does not sit to redetermine questions of fact." *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985). "The chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province." *Darnell v. Darnell*, 234 So. 3d 421, 424 (¶8) (Miss. 2017) (brackets and quotation marks omitted). "Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Bowen v. Bowen*, 982 So. 2d 385, 395 (¶42) (Miss. 2008) (quotation marks omitted). "This Court will not substitute its judgment for that of the chancellor even if this Court disagrees with the [chancellor] on the finding of fact and might arrive at a different conclusion." *Sanderson v. Sanderson*, 170 So. 3d 430, 434 (¶13) (Miss. 2014) (quotation marks, brackets, and ellipsis omitted).

¶23. The testimony on this issue was in conflict. While Brandi disputed the number of overnight visits that Sandra claimed, the chancellor found that Sandra was "more credible" than Brandi, and he found that Sandra had established a viable relationship with the children under the statute. We note that the statute requires the grandparent to prove "frequent visitation" but only "occasional overnight visitation." Miss. Code Ann. § 93-16-3(3). Applying our deferential standard of review, we cannot say that the chancellor clearly erred

11

by finding that Sandra had established a viable relationship with Olivia and Natalie.

  **II.**  **The chancellor did not abuse his discretion in applying the *Martin* factors or setting the amount of visitation.**

¶24. Under the statute, Sandra was required to establish not only a viable relationship with her granddaughters and an unreasonable denial of visitation but also that court-ordered visitation would be in the girls' best interest. Miss. Code Ann. § 93-16-3(2). "The best interests of the child must be the polestar consideration in awarding grandparent visitation." *T.T.W. v. C.C.*, 839 So. 2d 501, 504 (¶10) (Miss. 2003). As our Supreme Court has explained, the chancellor must consider the best interest of the children both "in determining *whether* the grandparent[] should receive visitation in the first place" and in determining "the *amount* of visitation" that should be allowed. *Smith*, 222 So. 3d at 264 (¶18).

¶25. The Supreme Court has identified ten factors ("the *Martin* factors") that the chancellor must consider in assessing the child's best interest:

> 1. The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time.
>
> 2. The suitability of the grandparents' home with respect to the amount of supervision received by the child.
>
> 3. The age of the child.
>
> 4. The age, and physical and mental health of the grandparents.
>
> 5. The emotional ties between the grandparents and the grandchild.
>
> 6. The moral fitness of the grandparents.

7. The distance of the grandparents' home from the child's home.

8. Any undermining of the parent's general discipline of the child.

9. Employment of the grandparents and the responsibilities associated with that employment.

10. The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.

*Id.* at 260 (¶6) (quoting *Martin*, 693 So. 2d at 916). The Court stated that "these factors are not all-inclusive," that "the chancellor should weigh all circumstances and factors as he feels to be appropriate," and that no one factor "should be weighed more heavily than the others." *Id.* (brackets and ellipsis omitted) (quoting *Martin*, 693 So. 2d at 916). The Court has also stated that "making findings of fact under the *Martin* factors is an integral part of a determination of what is in the best interests of a child." *T.T.W.*, 839 So. 2d at 505 (¶12).[7]

¶26.    The chancellor in this case analyzed each of the *Martin* factors. The chancellor found

---

[7] The Greers assert that *Smith*, *supra*, held "that the *Martin* factors were not designed to determine whether the best interest of the grandchild would be served to compel visitation." The Greers misread *Smith*'s holding. The *Smith* Court held that "[t]he *Martin* Court erred by instructing chancellors to consider the best interest of the child(ren) only in the context of the *amount* of visitation, after finding an entitlement to grandparent visitation under Section 93-16-3(1)." *Smith*, 222 So. 3d at 263 (¶15). The Court held that a chancellor also must consider the child's best interest in determining "*whether* the grandparent[] should receive visitation in the first place." *Id.* at 264 (¶18). The *Martin* factors remain applicable to a determination of the child's best interest. *See id.* at 260-64 (¶¶6-18); *Vermillion*, 281 So. 3d at 930 (¶14); *Lofton v. Lofton*, 176 So. 3d 1184, 1187 (¶13) (Miss. Ct. App. 2015); *Arrington v. Thrash*, 122 So. 3d 144, 149 (¶19) (Miss. Ct. App. 2013) ("*Martin* sets out ten factors for a chancellor to consider and discuss in determining both whether to award grandparent visitation and then, if it is awarded, its extent.").

13

that (1) visitation will not disrupt the children's lives or school activities because they will not be away from home for extended periods of time; (2) Sandra's home is suitable for visitation; (3) Sandra is able to care for young children; (4) Sandra is in good health; (5) Sandra has a "very loving" relationship with Olivia and Natalie; (6) there is "no question that [Sandra] is of good moral character"; (7) Sandra lives only fifteen minutes from the Greers; (8) there was no evidence that Sandra had undermined the Greers' discipline of the children; (9) Sandra works full-time cleaning houses and is responsible; and (10) Sandra testified that she will cooperate with the Greers and will not interfere with their parental authority. The chancellor then found that it would be in the children's best interest for Sandra to have visitation and awarded her visitation.

¶27. The chancellor's findings under the *Martin* factors are not clearly erroneous, and the Greers do not challenge any of the chancellor's specific findings. Rather, they argue that the chancellor awarded an "excessive" amount of visitation, that the *Martin* factors are "inadequate" for a case such as this, and that the award of visitation with Olivia and Natalie should be reversed because Sandra is not entitled to visitation with Collins. We address these arguments in turn.

¶28. In general, the amount of visitation awarded is within the discretion of the chancellor. *Martin*, 693 So. 2d at 915. However, the Supreme Court has made "clear . . . that visitation granted to grandparents should not be equivalent to that which would be granted to a non-custodial parent unless the circumstances overwhelmingly dictate that it should be." *Id.*

14

at 916. Thus, in *Martin*, the Court held that the chancellor abused his discretion by awarding grandparents extensive visitation equivalent to a typical non-custodial parent—i.e., two weekends per month, four weeks during the summer, and holidays and birthdays. *Id.* at 914, 916. The Court held that the chancellor's award was "excessive" and reversed and remanded for reconsideration of the amount of visitation. *Id.* at 916.

¶29.    In this case, the chancellor did not award such extensive visitation. Rather, the chancellor awarded Sandra one weekend per month, ten days in the summer, and no other holidays—i.e., less than forty percent of the "excessive" visitation granted in *Martin*. We cannot say that the chancellor abused his discretion in setting the amount of visitation. *See, e.g.*, *Woodell v. Parker*, 860 So. 2d 781, 790 (¶¶30-32) (Miss. 2003) (holding that an award of one weekend per month, two weeks in the summer, and holidays was not excessive); *Zeman v. Stanford*, 789 So. 2d 798, 804-05 (¶25) (Miss. 2001) (holding that an award of one weekend per month, one week in the summer, and holidays was not excessive); *Eaves v. Gatlin*, 194 So. 3d 171, 176 (¶¶17-18) (Miss. Ct. App. 2015) (holding that an award of one weekend per month, two weeks in the summer, and holidays was not excessive). The Greers complain that the chancellor's schedule grants Sandra more overnight visits than she enjoyed before their falling out. That may be true, but due to the Greers' complete denial of visitation, Sandra is no longer able to visit with the girls in their own home, on holidays or birthdays, or at any other time. Her only visitation is court-ordered visitation. Under these circumstances, we cannot say that the chancellor abused his discretion.

15

¶30. The Greers also argue that this Court should adopt additional factors to assist chancellors in determining whether grandparent visitation is in the child's best interest. They assert that although "the *Martin* . . . factors are helpful in a situation where a natural parent has died or had his parental rights terminated," the same factors are "inadequate" when the grandparent's own child objects to visitation. We disagree that any new test is needed. We previously have applied the *Martin* factors in such cases. *See, e.g.*, *Lofton*, 176 So. 3d at 1187 (¶13); *Walley v. Pierce*, 86 So. 3d 918, 921 (¶15) (Miss. Ct. App. 2011); *Ferguson v. Lewis*, 31 So. 3d 5, 8 (¶16) (Miss. Ct. App. 2009). More important, the Supreme Court has made clear that "[the *Martin*] factors are not all-inclusive" and that "the chancellor should weigh all circumstances and factors as he feels to be appropriate." *Smith*, 222 So. 3d at 260 (¶6) (brackets and ellipsis omitted) (quoting *Martin*, 693 So. 2d at 916). Therefore, the chancellor already has broad discretion to consider all relevant circumstances, including of course a parent's objections to visitation.[8]

¶31. Finally, the Greers argue that we should reverse the award of visitation with Olivia and Natalie because Sandra is not entitled to visitation with Collins. The Greers analogize to the principle in child custody cases that "in the absence of some unusual and compelling circumstance dictating otherwise, it is not in the best interest of siblings to be separated."

---

[8] If the chancellor finds that visitation is in the child's "best interest," the chancellor is "not required to defer automatically to [the objection of] a fit custodial parent." *Brown v. Yates*, 68 So. 3d 758, 762 (¶20) (Miss. Ct. App. 2011). To hold otherwise would "frustrate[] the purpose of the grandparent-visitation statute by allowing a parental veto of visitation in all circumstances—except where the custodial parents are unfit." *Id.*

*Holcomb v. Holcomb*, 164 So. 3d 1053, 1056 (¶18) (Miss. 2014) (brackets omitted). However, this principle is inapplicable in the context of grandparent visitation and has little significance in the context of separations lasting a weekend and, once a year, ten days. Furthermore, the Greers can avoid or minimize even these brief separations by allowing Collins to accompany her sisters on some or all of their visits with their grandmother.

## CONCLUSION

¶32. The chancellor did not clearly err or abuse his discretion by finding that Sandra had established a viable relationship with Olivia and Natalie, that the Greers had unreasonably denied Sandra visitation, and that visitation would be in the girls' best interest. Nor did the chancellor abuse his discretion in fixing the amount of visitation. Accordingly, we affirm the judgment of the chancery court with respect to Olivia and Natalie. However, Sandra failed as a matter of law to establish a viable relationship with Collins. Therefore, Sandra failed to satisfy the requirements of the grandparent visitation statute with respect to Collins, and a court has no authority to award a grandparent visitation outside the statute. Accordingly, we reverse and render the judgment to the extent that it awards Sandra visitation with Collins.

¶33. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE AND McCARTY, JJ., CONCUR. WESTBROOKS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD AND McCARTY, JJ. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. GREENLEE AND SMITH, JJ., NOT PARTICIPATING.**

**WESTBROOKS, J., SPECIALLY CONCURRING:**

¶34.    I agree with the majority; however, I write separately so that the Legislature will consider an amendment or revision of Mississippi Code Annotated section 93-16-3(3) (Rev. 2018). As the majority has indicated, grandparents do not possess a common-law right to visitation; therefore, this writer must appeal to the Legislature for such right to be created statutorily.[9] As a judicial officer, I understand that my capacity requires mere application and interpretation of the law, but it is still incumbent of me to highlight the possible detrimental effects that such application may have on voiceless minors and their best interests.

¶35.    "A viable relationship" under the statute is defined as

> a relationship in which the grandparents or either of them have voluntarily and in good faith supported the child financially in whole or in part for a period of not less than six (6) months before filing any petition for visitation rights with the child, the grandparents have had frequent visitation including occasional overnight visitation with said child for a *period of not less than one (1) year*, or the child has been cared for by the grandparents or either of them over a significant period of time during the time the parent has been in jail or on military duty that necessitates the absence of the parent from the home.

Miss. Code Ann. § 93-16-3(3) (emphasis added).

¶36.    As applied in the case here, because the grandchild, Collins, was not one year old at the time the grandmother, Sandra, was not able to prove a viable relationship. Therefore, only Olivia and Natalie will be granted visitation with their grandmother, leaving Collins to be isolated and separated from her siblings during their visits.

---

[9] *See Lott v. Alexander*, 134 So. 3d 369, 371 (¶6) (Miss. Ct. App. 2014).

18

¶37. Both researchers and social workers have long attested to the detrimental impact of sibling separations.[10] This statute provides a gateway for such separation to occur simply when the child is less than one year old. I believe that Sandra established a viable relationship with all three of her grandchildren, including Collins. She financially supported and frequently visited with all of the granddaughters; however, due to the one-year time requirement of the statute, she is not warranted visitation with Collins.

¶38. While I do believe there is a need to define a period of time as a viable relationship, the statute as written discredits the development of a viable relationship simply because a child has not reached the age of one. As an alternative, I believe the statute would be more inclusive and limit separation if a viable relationship can be proved during the majority of the child's lifetime or since birth.[11] While time (or one year) is certainly a factor, it is not the essential factor in determining if a deep relationship exists between a grandparent and

---

[10] Our Court has said, "[A]bsent 'unusual and compelling circumstances,' the best interests of the siblings will be served by keeping them together." *Brawley v. Brawley*, 734 So. 2d 237, 241 (¶12) (Miss. Ct. App. 1999) (quoting *Bowen v. Bowen*, 688 So. 2d 1374, 1380 (Miss. 1997)).

[11] While only persuasive authority, other jurisdictions, such as Virginia and South Carolina, respectively, acknowledge that a viable relationship can be established from birth. In *Decatur v. Eskam*, No. CH99-133, 49 Va. Cir. 357, 1999 WL 220399, at *2 (July 19, 1999), the court stated, "The evidence establishes that the grandparents have been an integral part of the child's life since birth. She has been in the grandparents' home regularly, and exhibits the greatest amount of love and affection toward them." The court in *Grantham v. Weatherford*, 819 S.E.2d 765, 769 (S.C. Ct. App. 2018), reiterated that a relationship may be established, stating, "Grandparents developed deep ties with their grandchildren from birth . . . , [and] [g]randparents foster this relationship by taking the children to and from school, cooking for the children, bathing the children, buying clothes for the children, and taking the children to doctor's appointments."

grandchild. Sandra was at the hospital when Collins was born. She watched after the baby and cared for Collins (alone and without the other girls) while Collins was sick and on medications. The chancellor even found that a sick Collins was left in Sandra's care while Luke and Brandi went out of town for a weekend getaway. In this case, what Sandra did for Collins is more significant than the fact that it did not happen for at least one year (an immutable fact that she could not control).

¶39.    Again, I am in concurrence with the majority because we must apply the law as written. However, I do believe it is incumbent for me to highlight when laws can be written to achieve a better resolution that is in the best interest of the child or children.

**McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**